## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 23 2016, 10:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: C.K., a Child Alleged to be in Need of Services,

F.R. (Mother) and B.K. (Father),

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

November 23, 2016

Court of Appeals Case No. 29A02-1603-JC-511

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

The Honorable Todd L. Ruetz, Magistrate

Trial Court Cause No. 29C01-1509-JC-1177

**Brown, Judge.**

[1] F.R. ("Mother") and B.K. ("Father," and together with Mother, "Parents") appeal the juvenile court's order determining that C.K. was a child in need of services ("CHINS"). Parents raise one issue which we revise and restate as whether sufficient evidence supports the juvenile court's determination that C.K. was a CHINS. We affirm.

## *Facts and Procedural History*

[2] Mother and Father are the married, biological parents of C.K., born April 13, 2015. Mother, age thirty-two, is an emergency room physician, and Father, age thirty-four, is an electrical engineer. On July 23, 2015, C.K. fell from a stroller while on a walk with his maternal grandmother, which resulted in cuts on the left side of his face around his forehead and hairline. C.K.'s grandmother called Mother about his condition, C.K. appeared normal when Mother observed him, and Mother reported the accident to C.K.'s pediatrician, who had no further concerns related to the fall from the stroller.

[3] On August 18, 2015, Mother fed C.K. and, at around 8:00 p.m., Father put him to bed. During the night, C.K. awoke once at approximately 1:00 a.m., and again between 3:00 a.m. and 4:00 a.m. Mother woke and attended to him on both occasions and breastfed him for approximately fifteen minutes before he returned to sleep. At approximately 5:45 a.m. Father awakened, showered, heard C.K. crying, and, after changing C.K.'s diaper, brought him to Mother, who was still sleeping, at approximately 6:00 a.m. Mother began to breastfeed him, and during that time she stayed in bed with him, nursing him and sleeping intermittently until 7:00 a.m. Meanwhile, Father left for work at approximately

6:30 a.m. Later that morning, Mother dropped C.K. off at the Goddard School at around 7:45 a.m. Danielle Mann, the lead teacher in the infant room, met Mother in the infant room that morning. Mann observed that C.K. seemed "[k]ind of normal," but she also noticed that "[h]e didn't really show a lot of expression or anything so." Transcript at 217. Mann also noticed that C.K. "wasn't really moving a lot," that C.K. "was awake after [she] took him" but that he "looked a little sleepier," and that he was not cooing or making noises at that time. *Id.* at 217-218.

[4] After Mother left, Mann went to the area rug where the infants play, sat down with C.K. in her arms, and, while C.K. was in her arms, he "[j]ust laid there," and she noticed that he did not make any movements with his arms or legs. *Id.* at 218. A short time later she "put him in the [M]amaRoo" because he "looked a little sleepy," and she noted that he was awake when she placed him there. *Id.* at 219. She buckled him into the MamaRoo, which is "an electric swing that plugs into the wall and it cradles them like side-to-side," and C.K.'s head rested in "a cup shape" portion of the swing. *Id.* at 220-221. The speed of the MamaRoo was not fast, a child's head does not move from side to side, and children generally "don't really move around in [the MamaRoo]." *Id.* at 222. Once C.K. was in the swing, Mann returned to playing with the other children and checked on C.K.'s breathing every five minutes. C.K. slept for about an hour when Mann noticed "a different breathing sound from him," observed that he did not respond and did not open his eyes when she tapped him, and she continued tapping him and talking to him but he was still non-responsive.

*Id.* at 223. She took him out of the MamaRoo and "held him against [her]" but his eyes were still not opening, and she went to the door and called for the Goddard School's Director, Amy Lamb and Assistant Director, Emily Shafer. *Id.*

[5] Mann, Lamb, and Shafer attempted to awaken C.K., but he was non-responsive. He was "still breathing," but it was a "gaspier kind of breath." *Id.* at 225. While Mann and Shafer were attending to C.K., Lamb called paramedics and Parents. Another parent, Amanda Born, an OB/GYN physician, was dropping off her children at Goddard and also attempted to rouse C.K. Dr. Born observed C.K. "lying on his back on the floor" while Mann and Shafer were trying to wake him up and that "he looked asleep" with "very, very poor tone, like he wasn't - - like he was in a very deep sleep basically but not responding to stimuli." *Id.* at 123.

[6] Lamb contacted Father at 9:11 a.m., and he immediately attempted to contact Mother. Mother contacted Lamb at 9:20 a.m., and was informed by Lamb that paramedics had been called. Mother requested that C.K. be transported to Riley Children's Hospital ("Riley"). Paramedics arrived, checked C.K.'s vital signs, observed that he was not responsive to painful stimuli, that his limbs were weak, and that his skin was cold and pale, and they decided to take C.K. to Indiana University North Hospital ("IU North"), which was the nearest hospital.

[7] C.K. was taken to IU North where he underwent testing which showed intracranial hemorrhaging, and he was transferred to the emergency department at Riley. Mother joined C.K. in the ambulance ride to Riley, and he twice vomited the sugar water he had been given at IU North. At Riley, Dr. Daniel Fulkerson, a pediatric neurosurgeon, attended to C.K. and characterized his subdural hematomas as severe and noted that "any time we see somebody with a subdural hematoma that just by itself I think is, I would classify as severe." *Id.* at 147. C.K. was observed with a bruise on the left side of his forehead, but there was no other evidence of fractures. C.K. spent three days in an intensive care room at Riley before he was transferred to a regular room for another four days. Tests revealed that he had subdural hematomas on both sides of his brain, which are collections of blood in the space between the brain and the skull, as well as hemorrhages to the retina of his right eye. Subdural hematomas are caused by a significant amount of force, either by impacting or striking the head, or the head is shaken with a significant and forceful back and forth movement. Retinal hemorrhages are often suspicious for a traumatic injury, but they also may be associated with non-accidental injuries or underlying conditions.

[8] Dr. Ralph Hicks, a professor of clinical pediatrics at Riley who is board-certified in the subspecialty of child abuse pediatrics and a member of Riley's child protection team, also evaluated C.K. and felt that his injuries "were suspicious for non-accidental trauma," but he acknowledged that other possibilities included "an accidental event that had not yet been disclosed or an accidental

event associated with a lapse of supervision, or an accidental event associated with neglect" which could have caused the injuries. *Id.* at 111. He explained that, if the cause of the injuries was an accident, "it would require a pretty forceful trauma to the head, some sort of significant impact to the head or the head impacting something." *Id.* Dr. Hicks also noted that "it takes a significant amount of force to cause this type of injury" and that the force involved in C.K.'s injury was "not the type of force that, forces that are involved with bouncing a baby on one's knee or your usual swings, baby infant swings or carriers. It's much more than that." *Id.* at 105.

[9]     That same day, the Department of Child Services ("DCS") received a report from Dr. Hicks that C.K. experienced head trauma as well as injuries around his right eye. DCS assessor Shalissa Kutzleb and Carmel Police Detective Trent McIntyre conducted an investigation into the cause of C.K.'s head injuries. Detective McIntyre interviewed Parents with Kutzleb present at Riley during the afternoon of August 19, 2015. Mother stated to Detective McIntyre and Kutzleb that she had experienced "problems with [C.K.] sleeping within the last two weeks . . . where he had used to sleep through the night he was now getting up there or four times a night," and Detective McIntyre was concerned with "the stressors in regard to [Mother] not sleeping and having problems with [C.K.] not sleeping," and that Mother did not provide "a lot of details . . . between the time that she woke up and fed him and took him to school." *Id.* at 387-388. On August 26, 2015, Parents took a polygraph examination at the Carmel Police Department. Father passed the polygraph while Mother failed it

based on her responses to whether she was involved with the injury that occurred to C.K. or if she injured C.K., and if she knew how C.K. was injured. When interviewing Mother at Riley, Detective McIntyre felt that Mother's "statements in regard to the sleep is one of the bigger things that shows a motive behind some type of injury" and that after the interview he observed Mother "laughing and talking with somebody else there that knew her through work. So there was just not as much distress visible." *Id.* at 421. Detective McIntyre informed DCS of the results of the polygraph, as well as his suspicion that Mother may have been involved in C.K.'s injuries based on the totality of his interaction with her.

[10] On September 2, 2015, DCS requested to initiate a CHINS filing seeking approval to take custody of C.K, and filed its CHINS petition. The petition alleged that C.K. was found to be "lethargic and unresponsive while at the Goddard School" and that he had subdural hematomas on both sides of his head as well as hematomas/hemorrhages around his eyes. Appellants' Appendix at 42. The CHINS petition also alleged that the injuries were non-accidental and that Mother failed a polygraph examination regarding C.K.'s injuries. That same day, the juvenile court held a detention hearing, ordered C.K.'s detention and continued placement in the family home, permitted Mother to return to the home, and ordered that all of Mother's contact with C.K. be supervised. The juvenile court held an initial hearing on September 17, 2015, at which Parents denied the allegations contained in the CHINS petition.

[11] On October 13, 2015, Mother underwent psychological testing with Dr. Robin Kohli, which included the Minnesota Mulitphasic Personality Inventory, Parenting Stress Index, Adult Substance Subtle Screening Inventory, Child Abuse Potential Inventory, and the Rorschach Inkblot Test. Dr. Kohli had not reviewed any materials from DCS or other sources prior to her evaluation, and, based upon her assessment of Mother and Parents' self-assessment, noted that Mother had previously experienced three panic attacks and experienced anxiety and depressive symptoms. Mother did not report to Dr. Kohli that C.K. had been having trouble sleeping. Dr. Kohli observed that Mother "appeared to process information slowly and carefully, resulting in slower responding on the objective personality tests that would otherwise be expected given her high level of intelligence." Parents' Exhibit W at 1. Dr. Kohli's report noted that Mother's responses to the questions indicated defensiveness and situational-related depression and anxiety, and that, although Mother did not fall into the risk factors of shaken baby syndrome, she noted that depression, stress, and a colicky or fussy child could be risk factors and could not definitively exclude Mother as a perpetrator.

[12] On November 2, 16, and 30, 2015, the juvenile court held a fact-finding hearing at which it heard testimony and received exhibits consistent with the foregoing. On December 28, 2015, the court entered an order ("the Order"), which contained detailed findings of fact and conclusions of law, determining that C.K. was a CHINS under Ind. Code §§ 31-34-1-1 and 31-34-1-2. The Order also applied the rebuttable presumption statute, Ind. Code § 31-34-12-4.

On January 5, 2016, the guardian ad litem ("GAL") filed a report for the dispositional hearing, and DCS filed a parental participation plan as to Mother and Father respectively. In the report, the GAL recommended that C.K. remain in the home with Mother and Father and that Mother have unrestricted visitation with C.K. Mother filed a petition for unsupervised visitation on February 4, 2016, and, the juvenile court held a dispositional hearing on February 22, 2016. The court entered a dispositional order on February 26, 2016, and on March 29, 2016, DCS filed a motion to terminate jurisdiction and discharge the parties, which was granted on March 31, 2016.

## *Discussion*

The issue is whether sufficient evidence supports the juvenile court's determination that C.K. was a CHINS. In reviewing a juvenile court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* DCS is required to prove by a preponderance of the evidence that a child is a CHINS. *In re A.H.*, 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). When a court's order contains specific findings of fact and conclusions of law, we engage in a two-tiered review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We reverse the juvenile court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if it is unsupported by the

findings and conclusions. *Id.* When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. *Id.*

[15] Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] Ind. Code § 31-34-1-2(a) provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
>
> (2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Finally, Ind. Code § 31-34-12-4 provides:

A rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:

(1) the child has been injured;

(2) at the time the child was injured, the parent, guardian, or custodian:

(A) had the care, custody, or control of the child; or

(B) had legal responsibility for the care, custody, or control of the child;

(3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and

(4) there is a reasonable probability that the injury was not accidental.

The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d at 306. Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose

of a CHINS adjudication is not to punish the parents, but to protect the child. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*.

[18]   Parents challenge Findings 10, 18-23, 25-32, 34-45, 47-48, 50-60, and 62-66 and Conclusions 1 and 3-9 of the Order.  Parents also assert that the juvenile court erroneously applied the rebuttable presumption statute.  DCS maintains that the evidence supports the findings, that the conclusions support the judgment, and that the Parents' challenges to the findings and conclusions are a request to reweigh evidence.  It argues that the juvenile court properly applied the rebuttable presumption statute, Parents did not rebut the presumption, their argument "misapprehend[s] the statute," and that the juvenile court was entitled to weigh the evidence with respect to application of the rebuttable presumption statute.  Appellee's Brief at 29.  In reply, Parents assert that DCS has waived its arguments on appeal, and that its failure to address their arguments leads to the conclusion that the standard of review should be *prima facie* error.

[19]   Parents challenge the following Findings and Conclusions of the Order:

   FINDINGS OF FACT:

   * * * * *

   10.  When Mother handed [C.K.] to Ms. Mann, [C.K.] had his
   eyes open and appeared to be fully awake but Ms. Mann noted
   he also appeared sleepy and did not show a lot of expression.
   [C.K.] was responsive to Ms. Mann's voice by looking at her, but
   he did not move or reach for her as normal and made no noise.

[C.K.] made no movements of his arms or legs. After Mother left, Ms. Mann sat down with [C.K.] on the floor holding [C.K.] in her arms. Although awake, [C.K.] continued to appear sleepy, his eyes closing then opening, so she put him in a baby swing to sleep. [C.K.] was placed in the swing about 15 minutes after Mother left the daycare. It was not uncommon for [C.K.] take such morning naps.

* * * * *

18. [C.K.] also underwent numerous diagnostic tests ruling out, other than trauma, any indication of an underlying medical reason, condition or cause of [C.K.'s] injuries of subdural hematomas and retinal bleeding.

19. The force causing [C.K.'s] injuries would be significant acceleration or deceleration or rotation of the head and would be from either something impacting or striking the head, the head striking something, or the head being shaken with significant back and forth movement. According to Dr. Hicks, the type of force needed to cause this type of injury was much more than the force involved in bouncing a child on ones [sic] knee or the typical baby swing. Dr. Fulkerson concurred with the finding that the subdural hematomas were caused by some type of abnormal motion and that said motion would have to be more than a rocking motion in a swing.

20. The types of events that cause these injuries involve a significant amount of force which would be noticed by a reasonable caregiver.

21. According to Dr. Hicks, the injury to [C.K.] was either due to non-accidental trauma, an accident without disclosure (one in which the caregiver was aware of the accident but failed to report

the accident), an accident due to neglect, or an accident due to lack of supervision.

22. All four possibilities that Dr. Hicks presented as the possible cause of the injury to [C.K.] would only arise due to an act or omission of a caregiver. Nondisclosure of an accidental injury would fall under an omission of a caregiver as the expectation of a reasonable caregiver. In this circumstance, a reasonable caregiver would seek out medical care for [C.K.]. With [C.K.] being four months of age, and being of limited mobility, there is a reasonable probability that the injuries to [C.K.] were non-accidental in this case.

23. Nothing unusual or abnormal happened at the daycare on August 19, 2015 that would have caused [C.K.'s] injuries. Nothing said by Ms. Mann or other daycare staff to Det. McIntyre gave him concern in his criminal investigation that any of them were the perpetrators of [C.K.'s] injuries.

* * * * *

25. The exact time when [C.K.'s] injuries occurred cannot be precisely pinpointed. However, based on Dr. Hick's [sic] experience he states a relative time frame for the injuries can be determined. Infants who have these types of injuries will develop symptoms very rapidly after the traumatic event and often symptoms are immediate. If not immediate, symptoms develop very quickly. These symptoms include a change in mental status demonstrated by a depreciation in their level of alertness, ability to make eye contact, and their response to stimuli. They may develop irritability, sleepiness, lethargy, even coma.

26. The recognition of these symptoms from the onset of the trauma depends upon the severity of the injury. The symptoms can be more subtle and more difficult to recognize if the injury is

mild or moderate in degree.  The significance of a moderate degree of severity is that the symptoms of such an injury may not be as immediately apparent as when an injury is more pronounced.

27.  There is a spectrum to determine the severity of such injuries.  [C.K.'s] subdural hematomas were on the moderate degree in the severity spectrum based on the testimony of both Dr. Hicks and Dr. Fulkerson.  In expanding on the classification of moderate, Dr. Fulkerson described [C.K.'s] subdural hematomas were not severe enough for immediate surgery but not minor pools of blood either.

28. The emergency responders who examined [C.K.] at the daycare also classified his head injury as moderate, placing it as a 10 on the Glasgow Coma Scale which falls into the severity category of a moderate head injury.

29.  While the change in breathing occurred approximately an hour after [C.K.] was left at the daycare there is evidence strongly suggesting other symptoms were, or had already been, demonstrated by [C.K.] when [C.K.] was exchanged from Mother to Ms. Mann.  Dr. Hicks identified the typical symptoms for this type of head injury could include, alteration in mental status; sleepiness, lethargy or coma; irritability; difficulty feeding; vomiting; seizures or convulsions; or difficulty in moving arms and legs normally.  Not all of the symptoms will necessarily occur immediately and those that do occur immediately may not be easily recognized as a symptom.  Symptoms may be subtle or more difficult to recognize in moderate injuries, as in [C.K.'s] case, and symptoms may come on more gradually and develop into more severe symptoms later.

30.  There is evidence that at some point after the onset of symptoms [C.K.] vomited and may have, within a few days after

the injury, suffered a seizure. While these would be indicative that the symptoms were increasing in severity, they do not indicate that the head injury itself rose from the moderate category, as was identified by both Dr. Fulkerson and Dr. Hicks, to the severe category. As such, they are of little probative value in determining how severe or evident the symptoms would be at the time of the traumatic event itself.

31. According to Dr. Hicks, two possible symptoms could be that a child appears sleepy and exhibits poor feeding, both of which were present in this case at the time [C.K.] was dropped off at daycare by Mother. Additionally, [C.K.] did not show much expression as [C.K.] was delivered by Mother to Ms. Mann. Although [C.K.] was responsive to Ms. Mann's voice by looking at her, he did not move or reach for her as normal and made no noise. Moreover, [C.K.] made no movements of his arms or legs. [C.K.] then continued to appear sleepy, his eyes closing then opening, while being held by Ms. Mann.

32. Further, the fact that the hour long feeding was noted as significant by Mother on the day the injury to [C.K.] was discovered, along with Mother's own testimony that [C.K.] may not have been actually feeding the entire time, the Court finds that the hour long feeding on August 19, 2015 was more likely a result of [C.K.] having trouble feeding which the court finds to be a symptom of poor feeding.

* * * * *

34. The Court finds Ms. Mann's testimony in its entirety to be credible and consistent with previous statements she had given to Det. Trent McIntyre of the Carmel Police Department. Ms. Mann appeared to be forthright in her testimony including her acknowledgment that she allowed [C.K.] to continue sleeping in

the swing, contrary to the daycare's policy, rather than placing [C.K.] in a crib after falling asleep.

35. The court finds and that the greater weight of the evidence is that [C.K.] was injured prior to being left with Ms. Mann the morning of August 19, 2015 and Ms. Mann is not responsible for the injuries suffered by [C.K.].

36. The greater weight of the evidence is that [C.K.'s] injuries occurred while in the care of Mother.

37. Scans of [C.K.'s] subdural hematomas portrayed multiple densities with both acute (recent) bleeding and chronic (old) bleeding suggesting more than one event and different time frames for the occurrences causing the hematomas. The fact that a child of four months age suffers from one subdural hematoma is a risk factor for non-accidental trauma warranting a panoply of protocols, assessments and evaluations by the Riley child protection team. The fact that [C.K.'s] scans showed more than one subdural hematoma, suggesting more than once occasion of injury, heightens the level of concern for repetitive trauma to [C.K.].

38. Dr. Sarah Hill, [C.K.'s] pediatrician, testified that one of the symptoms of a child suffering a head injury would be inadequate feeding. When questioned by counsel for parents, Dr. Hill testified that she would not expect a child who had suffered a brain injury to feed for an hour. However, Mother acknowledged that [C.K.] may have stopped and restarted feeding at times throughout the hour. Mother further stated that [C.K.] can typically get everything he needs as far as nourishment within fifteen minutes of feeding. The Court finds that there is a difference between a child actually feeding for an hour and for a child taking an hour to feed. The first implies

continued feeding, while the second suggests a child having trouble feeding.

39. On the morning of August 19, 2015 Mother advised Ms. Mann that [C.K.] had taken an hour to eat that morning, which was twice as long as he usually took to feed. Under the circumstances presented, the court finds Mother was reporting an unusual event and difficulty with feeding, and as such, is a symptom of trauma to [C.K.].

40. Mother was alone with [C.K.] on the morning of August 19, 2015. On, August 18, 2015, the day prior to the incident, Mother nursed [C.K.] and Father put [C.K.] to bed between 7:00 p.m. and 8:00 p.m. Mother then went to bed about 8:45 p.m., later expressing to Detective McIntyre that she was very tired and had little sleep the night before on August 17, 2015. [C.K.] awoke at 1:00 a.m. and again at 4:00 a.m. [in] the early morning hours of August 19, 2015 with Mother getting up to take care of and nurse [C.K.]. Each feeding occasion took about 15 minutes before laying [C.K.] back down to sleep. On August 19, 2015 [C.K.] then awoke again at about 5:45 a.m. at which time Father changed [C.K.] and left [C.K.] with Mother again to nurse. [C.K.] was awake, responsive[,] even smiling at Father at the time. Father left for work about 6:45 a.m. leaving [C.K.] in Mother's care. Mother then delivered [C.K.] to daycare at 7:53 a.m.

41. While one symptom alone may not be enough to indicate that the injury to [C.K.] occurred prior to his being brought to the daycare that morning. The Court finds by a preponderance of the evidence that the cumulativeness of these symptoms, both before and at the time [C.K.] was brought to daycare, demonstrates that [C.K.] was more likely than not to have suffered the injury prior to his arrival at the daycare and was already in distress at the time of his arrival at the daycare.

42. Mother has also given inconsistent statements as to the lack of sleep for both her and [C.K.] around August 19, 2015. Mother reported that [C.K.] was a pretty good sleeper, easy to take care of and not fussy. She also testified that she had plenty of sleep the night of August 18, 2015. Yet on August 19, 2015, she told Det. McIntyre that she did not get much sleep on August 17, 2015 that she had experienced recent problems with [C.K.'s] sleeping patterns. [C.K.] had been sleeping through the night, but was recently getting up 3 or 4 times a night. Mother described it as being a "nightmare" during this time. Mother told the detective that she had gotten up at least twice that night (August 18 through August 19, 2015) to feed [C.K.] which she described as normal feedings. Mother then stated that the next thing she knew Father awakened her to give her [C.K.] to feed in the morning when Father left for work. Mother tried to have [C.K.] lay with her so she could go back to sleep before work. Mother told the detective that pretty soon she realized that that was not going to happen and it would be another day of no sleep. Mother said [C.K.] was crying when she first got him that morning. Mother also talked to the detective about being stressed at work.

43. Mother further told the detective that [C.K.] had fed normally that morning, which is inconsistent with what Mother told Ms. Mann earlier when Mother left [C.K.] at the daycare.

44. When asked, Mother provided little detail to Detective McIntyre as to the morning events transpiring on August 19, 2015 prior to her delivering [C.K.] to daycare.

45. Details as simple as where Mother placed [C.K.] on the morning of August 19, 2015 changed over time. On August 19, 2015, the day she was first interviewed by Det. McIntyre, Mother said that after feeding [C.K.], she placed [C.K.] in his swing. Days afterwards, while talking with her attorney, she recalled that she had left [C.K.] on the bed. The Court finds it is much

more likely that the details of an event are better recalled close to the timing of the event then it would be several days later. Moreover, placing [C.K.] in a swing would be inconsistent with the suggestions that [C.K.] may have sustained his injuries as a result of being placed in a swing at daycare, a suggestion made by [Parents] during the course of the proceeding.

* * * * *

47. The Court finds that the multiple instances of conflict, alteration, and/or omission by Mother in her testimony and previous statements to others discredit her overall testimony.

48. No one has come forward with details of actual events that caused the injuries to [C.K.]. [C.K.] suffered no accidents that would have caused the injuries.

* * * * *

50. The court finds that the presumption of I.C. 31-34-12-4 has been raised by the state in this case by competent evidence of probative value that [C.K.] has suffered, as a result of non-accidental trauma, two subdural hematoma's [sic] on the brain and retinal bleeding while in the care of [C.K.'s] parent and that the injuries would not ordinarily be sustained except for the act or omission of the parent.

51. Evidence offered by way of video recording to suggest [C.K.] was asymptomatic at the time [C.K.] was delivered to daycare is not persuasive. The Court, having viewed the surveillance video as [C.K.] entered into the daycare on August 19, 2015, notes that [C.K.'s] eyes were open. Albeit, there was no observable movement of [C.K.'s] head, arms or legs to indicate any level of alertness. The Court also takes into consideration the testimony

of Dr. Hicks that simply because a child's eyes are open does not necessarily mean that [C.K.] is alert. According to Dr. Hicks, when an individual sustains a brain injury, the eyes may remain open, but he may not be able to comprehend things.

52. Mother's interactions with and care for [C.K.] at the hospital after the injuries were sustained, as reflected in pastoral care notes, the psychological assessment, the social work report, and the release of information to DCS and the Carmel Police Department are not persuasive that Mother is not responsible for [C.K.'s] injuries. [Parents] point to observations within the medical records of Mother's interaction with [C.K.] at the hospital after the injury occurred as indicative as to whether or not Mother caused the injury to [C.K.]. The fact that a parent is attentive to a Child's needs after an injury, in and of itself, does not negate the possibility that the parent is responsible for the injury. In this same regard, the court notes that there is evidence of Mother being observed in the hospital laughing with a friend and/or acquaintance while [C.K.] is being treated for a traumatic brain injury. This demonstrates there may be no correlation between [C.K.'s] injury and the Mother's emotions exhibited afterward.

53. [Parents] present evidence that [C.K.] had fallen from a stroller on July 23, 2015 to suggest a cause of [C.K.'s] injuries observed on August 19, 2015. The court finds there is no nexus between this earlier fall and the later injuries based upon the testimony of Dr. Hicks. The court rules out this fall as a cause of [C.K.'s] injuries discovered on August 19, 2015.

54. Dr. Daniel Fulkerson, the neurosurgeon who evaluated [C.K.] on August 19, 2015 and thereafter, believes there is some indication that [C.K.] may have had a predisposition to bleeding on the brain. He posited that [C.K.] had some enlarged extra-axial cerebrospinal fluid spaces (BEFI) that, by theory, may have predisposed [C.K.] to bleeding on the brain due to enlarged

spacing between the brain and skull. But, such a predisposition for bleeding by such a condition cannot be scientifically proven and such bleeding even with such a condition, according to Dr. Fulkerson, would still be the result of a traumatic event. Moreover, Dr. Hicks determined that the pattern of findings which [C.K.] presented would not be the same as expected with BEFI. The neuroradiologist, with whom Dr. Hicks consulted and with whom he reviewed [C.K.]'s scans, did not feel there was definite evidence for enlargement or widening between [C.K.'s] brain and skull to justify this position by Dr. Fulkerson. Notwithstanding, a BEFI condition would not account for the retinal hemorrhages according to Dr. Fulkerson. Retinal hemorrhages in infants and young children caused by trauma are unusual with accidental injuries and are more concerning for non-accidental injury. The court finds that Dr. Fulkerson's opinion [C.K.] may have the BEFI condition does not outweigh the preponderance of the evidence presented by the state or rebut the presumption raised by the state.

56. [Parents] hired a psychologist, Dr. Robin Kohli, to complete a psychological evaluation which was admitted into evidence as Defendant's Exhibit W. In the evaluation, Dr. Kohli opines Mother "does not meet the research based evidence that is correlated with individuals who perpetrate non-accidental injuries against their infants" and "testing results did not suggest risk to reoffend." The Court finds that the psychological evaluation was effectively discredited by DCS and should be relegated little probative value in Mother's favor. On the contrary, the evaluation provides evidence of probative value that Mother suffers from stress increasing the likelihood that she is the perpetrator of [C.K.'s] injuries and fails to rebut the presumption raised by the state.

a. Mother reports to Dr. Kohli that she has had, over a sustained time, numerous bouts of anxiety brought about by various stressors accompanied by lack of sleep. Stressful circumstances

and lack of sleep have been presented accompanying the occurrence of [C.K.'s] injuries. Mother was previously prescribed medication for anxiety, has stopped taking the medication, but still exhibits symptoms of anxiety.

b. Mother failed to advise Dr. Kohli that she was experiencing difficulty with [C.K.'s] sleep patterns. She described [C.K.] as easy to care for and did not describe the circumstances leading up to [C.K.'s] injuries as a "nightmare" as she described to Det. McIntyre. Mother failed to inform Dr. Kohli that [C.K.] had not been sleeping well around the time of the injury, a fact which Dr. Kohli admitted may have made a difference in her assessment.

c. Dr. Kohli relied only on information reported to her by Mother. She did not review any documentation by DCS or others.

d. Dr. Kohli acknowledged during her testimony that the test results are subjective.

e. By her own account, Dr. Kohli noted in the assessment that Mother's "overly concerned response style may have limited the validity of the testing, as it was later observed that she presented with a defensive style on several of the tests. While none of the measures were invalidated by this response style, her excessive caution limited the utility of several of the tests."

f. Dr. Kohli noted within the psychological assessment that Mother's responses to the Rohrshach Inkblot Test "suggested that she is currently under a fair amount of stress, which may impact her ability to cope with everyday stressors and events. She also tends to internalize her feelings, avoiding overt emotional expression." Dr. Kohli testified that when a person internalizes their feelings, the person can have problems coping with those feelings.

g. As part of the psychological assessment, Dr. Kohli evaluated Mother in relation to Shaken Baby Syndrome by comparing Mother to several risk factors. Dr. Kohli acknowledged in her testimony that the risk factors she listed as definitive were in fact only suggestive in the research articles she relied upon in making her evaluation. She also acknowledged that her research articles noted research on such risk factors was woefully inadequate.

h. Dr. Kohli further acknowledged that the research articles on which she relied indicated that infant shaking is much more likely to result from a moment of extreme stress and frustration, and takes the form of an unreasoned and impulsive act. In most cases, the shaking occurred by the perpetrator when they were alone caring for the child and where there were no witnesses and little or no evidence of ongoing abuse.

i. Dr. Kohli opined that Mother met none of the known risk factors which would place her at risk for physically abusing [C.K.] through non-accidental infant trauma, despite previously listing findings of stress and depression in the assessment, which were two of the risk factors she listed.

j. A third risk factor identified by Dr. Kohli, was when an infant has difficult temperament, is colicky or fussy, cries excessively, or [is] difficult to soothe. As noted previously, Mother chose not to disclose to Dr. Kohli that [C.K.] had not been sleeping well at the time of the injury and that it had been a "nightmare" as she disclosed to Det. McIntyre. To the contrary, Mother told Dr. Kohli that [C.K.] sleeps well and that he was an easy baby. Dr. Kohli acknowledged that if [C.K.] had been sleeping well, but then wasn't, that would possibly be important.

k. Dr. Kohli testified that she could not definitively exclude Mother as the perpetrator based on her assessment.

57. Mother points to her ability to handle stress in her occupation as an emergency room physician as proof that she, in a moment of extreme stress, would not harm [C.K.]. The court notes that during her evaluation, Dr. Kohli observed Mother "appeared to process information slowly and carefully, resulting in slower responding on the objective personality tests than would otherwise be expected given her high level of intelligence." Dr. Kohli further states her impression that Mother's overall testing results "also indicated a tendency to be indecisive and rely on others to make decisions." The court finds that this behavior and characteristic difficult for a person in Mother's position suggesting Mother's ability to handle stressors at work may also be difficult for her or overcome with much effort. Notwithstanding, the Court finds Mother's ability to handle stress at work is not compelling as to whether she harmed [C.K.]. The court finds this evidence does not outweigh the evidence presented by the state and dos not rebut the presumption raised by the state.

58. Based on the evidence presented and inconsistencies in Mother's own statements, the Court finds by a preponderance of the evidence that the injuries to [C.K.] happened while in Mother's care and [sic] were caused by an act or omission of Mother. Mother was alone with [C.K.] the morning of August 19, 2015. Mother is the one person who has given inconsistent accounts at various times and to various people.

59. The Court finds that the parents have not presented evidence sufficient to refute the rebuttable presumption raised by the state.

60. [C.K.] is in need of services and the coercive intervention of the court is necessary to achieve those services. A Child and Family Team Meeting (CFTM) was held prior to September 1, 2015. At the CFTM [Parents] initially expressed a willingness to participate in services provided by DCS. But, after DCS service referrals were made for parenting assessment(s), home based

services, and "first steps" for [C.K.], those services were ultimately rejected by the parents' counsel. Those services would have provided an assessment of parenting techniques with possible further recommendations, home based services including parental assistance and childcare if needed, and evaluation of [C.K.'s] development due to the injuries suffered. [Parents] have not participated in any of the services which Ms. Lawson referred. Case closure is not recommended by DCS at this time due to the lack of provision and/or participation in these services.

* * * * *

62. Diane Crider, Guardian ad Litem, testified that she has no safety concerns with Mother and [C.K.'s] safety. The court is not persuaded by the GAL's testimony under the circumstances. Ms. Crider acknowledged that she was assigned to the case just prior to November 2, 2015. Since that time she has only been to the home three times, each time for one hour and has spent a total of less than three hours observing Mother with [C.K.].

63. [C.K.] is at risk for additional injury if [C.K.] remains in the environment in which the injury occurred. While [C.K.] appears to be recovering from his injuries, any ongoing effects from the injuries may not be evident for many years, including possible development of seizures and possible delays in development that may not be discovered until [C.K.] is older.

64. Mother admits that she has a history of anxiety including panic attacks. Mother continues to suffer from anxiety due to life stressors. As noted by Dr. Kohli, Mother was previously prescribed medication for anxiety, has stopped taking the medication, but still exhibits symptoms of anxiety.

65.  Without adequately addressing the risk factors displayed by Mother, [C.K.'s] safety cannot be assured while in Mother's care.

66.  Each enumerated paragraph above individually and cumulatively supports the found fact that [C.K.] is a Child in Need of Services.

* * * * *

CONCLUSIONS OF LAW:

1.  This Court has jurisdiction over the parties and subject matter pursuant to Indiana Code 31-30-1-1(2) and Indiana Code 31-30-2-1.

* * * * *

3.  At the time [C.K.] was injured [Parents] had the care, custody or control of [C.K.]; or had the legal responsibility for the care, custody, or control of [C.K.].

4.  The injury would not ordinarily be sustained except for the act or omission of a parent, guardian or custodian.

5.  There is a reasonable probability that the injury was not accidental.

6.  Pursuant to IC 31-34-12-4 there is a rebuttable presumption that [C.K.] is a child in need of services because of an act or omission of [C.K.'s] parent, guardian or custodian.  That presumption has not been rebutted by the evidence presented.

7.  [C.K.] is a child in need of services as defined in IC 31-34-1-1 in that his physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of his parent, guardian or custodian to provide him with necessary food, clothing, shelter, medical care, education or supervision.

8.  [C.K.] is a child in need of services as defined IC 31-34-1-2 in that [C.K.'s] physical or mental health was seriously endangered due to injury by the act or omission of [C.K.'s] parent, guardian or custodian.

9.  [C.K.] needs care, treatment or rehabilitation through providing services for [Parents] for the benefit and safety of [C.K.] and/or for [C.K.] that [C.K.] is not currently receiving and is unlikely to be provided or accepted without the coercive intervention of the court.  These services are necessary to ensure that [C.K.] will not be further harmed.

Appellants' Appendix at 7-17.

[20]     The juvenile court based its CHINS determination on evidence that in August of 2015, C.K. suffered injuries while in Mother's care, specifically, subdural hematomas and retinal hemorrhaging.  Parents do not dispute that C.K. suffered these injuries which are consistent with a traumatic injury.  The juvenile court held a three-day fact-finding hearing and was in the best position to evaluate the evidence that was presented.[1]

---

[1] Parents challenge findings related to sleepiness and lethargy as symptoms of a traumatic head injury.  We note that Dr. Hicks testified that differentiating between sleepiness and lethargy "can be difficult to judge" based on the "significance or severity," *id.* at 185, of the injury, but the court heard Dr. Hicks specifically

[21]     As to whether C.K. was showing symptoms of a head injury when he arrived at Goddard, Mother was alone with him for a little over an hour after Father left for work and prior to dropping him off at Goddard. Upon his arrival at Goddard Mann testified that C.K. "didn't really show a lot of expression or anything so," he "wasn't really moving a lot," he "was awake after [she] took him" but that he "looked a little sleepier," and that he was not cooing or making noises. Transcript at 217-218. Dr. Hicks testified that symptoms of a head injury include:

> [A] change or alteration in the mental status so that the infant is not normal with respect to their level of alertness, ability to make eye contact, to respond, for example, by smiling if they're at an age where they're doing that. They may develop irritability, they may develop sleepiness or lethargy or even coma. They may have difficulty fee[d]ing, they may have vomiting. There might be seizures, convulsions. There may be difficulties or abnormal, abnormalities in the abilities to move the arms and legs normally.

*Id.* at 114-115. Dr. Hicks characterized C.K.'s injuries "as moderate in degree because of his symptoms that he developed and the findings on his head imaging," and that symptoms in a moderate injury "may be more subtle or more, a little more difficult to or challenging to recognize." *Id.* at 115. The juvenile court also heard Dr. Hicks testify that symptoms "can be immediately severe, they can come on more gradually and then develop into severe distress

---

testify that "sleepiness or lethargy" occur as symptoms of a traumatic head injury. *Id.* at 114. Aided by the expert medical testimony, the court was best positioned to weigh the evidence, judge the credibility of the witnesses, and determine whether C.K. was showing symptoms of a traumatic head injury.

later." *Id.* at 203. Dr. Fulkerson testified that the acute blood on C.K.'s CT scan suggested that the trauma causing his injuries "happened within hours to days, maybe up to a week, but probably within a day or so." *Id.* at 158. Detective McIntyre testified that Mother did not provide "any real interaction that she talked about other than just sitting him down while she got ready for work" in the time period prior to C.K.'s arrival at Goddard, and he testified that "newer parents will talk in a lot more detail about their interactions with babies." *Id.* at 388. Detective McIntyre also testified that he "didn't have concerns" regarding the sequence of events at Goddard based on the information he received from the Goddard employees during his investigation. *Id.* at 430. The record supports the juvenile court's findings as to whether C.K. was demonstrating symptoms of a head injury on the morning of August 19, 2015 and is supported by the evidence. Parents' arguments are a request that we reweigh the evidence, which we cannot do.

[22] As to the possible causes and medical impact of C.K.'s injuries, Doctor Hicks testified that "retinal hemorrhages that are due to, that are caused by trauma, particularly in infants and young children, are unusual with accidental head injuries. They're more concerning for a non-accidental injury . . . ." *Id.* at 107. Dr. Hicks also testified that C.K.'s injuries "were suspicious for non-accidental trauma" but acknowledged that other possibilities included "an accidental event that had not yet been disclosed or an accidental event associated with a lapse of supervision, or an accidental event associated with neglect." *Id.* at 111. He explained that if the cause of the injuries was an accident "it would require a

pretty forceful trauma to the head, some sort of significant impact to the head or the head impacting something." *Id.*

[23] Dr. Fulkerson, who treated C.K. at Riley, explained that a subdural hematoma "is a severe event," that it was possible C.K. suffered a seizure, and that a symptom for a seizure in a four-month old infant is unresponsiveness. *Id.* at 147. Dr. Fulkerson also explained that C.K. appeared to have benign extra-axial fluid, and that, even with that condition, repetitive motion in a swing that goes side to side or up and down would not likely cause a re-bleed of an existing subdural hematoma. Dr. Fulkerson also explained that the MRI showed that C.K. suffered subdural hematomas of different densities which would "suggest changes in timeframe" and that the injuries were "moderate" but "worse than just a little tiny skoosh of blood." *Id.* at 161. He added that the CT scan showed findings of both acute and chronic blood, that "[w]hen we see findings that would suggest there is multiple densities, in other words, suggesting multiple times, that is another thing that we think is a risk factor for non-accidental trauma," *id.* at 162, and that multiple densities of the subdural fluid on the MRI and the CT scan caused him to "worry about multiple events" which may suggest "there is something repetitive going on and also again something that trips our concern for the child." *Id.* at 165-166. With respect to the relationship between benign-extra axial fluid and the presence of retinal hemorrhaging, Dr. Fulkerson stated that "[j]ust BEFI in itself will not cause retinal hemorrhages" and that the presence retinal hemorrhaging raises the concern that it is caused by trauma. *Id.* at 173. The medical testimony related

to the severity and possible causes of C.K.'s injuries is reflected in Findings 18-22, 25-32, 37, 38, 51, and 53-55, and Parents' arguments are a request to reweigh the evidence, which we cannot do.

[24] With respect to Parents' argument that the juvenile court incorrectly applied the rebuttable presumption statute, we note that the juvenile court had before it sufficient evidence to establish that C.K. suffered injuries, that while he was in Mother's care he was showing symptoms of a head injury upon his arrival at Goddard, that his injuries are of a type not ordinarily sustained except for an act or omission of a parent, and that the injuries were not accidental. Parents' argument requires us to reweigh the evidence the juvenile court had before it, and we cannot say that the court erred in applying the rebuttable presumption statute or that Parents presented sufficient evidence to rebut the presumption. *See In re C.B.*, 865 N.E.2d 1068, 1073 (Ind. Ct. App. 2007) (holding that "[w]hile it is not certain whether Mother inflicted these injuries upon C.B." the evidence presented raised the presumption under Ind. Code § 31-34-12-4 that C.B. was a CHINS), *trans. denied*.

[25] With respect to Parents' challenges to C.K.'s continued safety and Mother's mental health, the court heard the testimony of C.K.'s GAL, who was assigned to the case in November 2015, and, despite her testimony that she did not have safety concerns with Mother being alone with C.K., concluded that the GAL had not spent sufficient time around the family to determine the safety of the home environment and chose not to give her testimony significant weight. The court also heard Dr. Kohli's testimony and reviewed her report, which noted

Mother's defensive response style as well as her issues related to general anxiety. We cannot say that the juvenile court abused its discretion in failing to afford the same weight to the testimony of the GAL and to the testimony and report of Dr. Kohli as Parents urge this Court to do.

### *Conclusion*

Based upon the foregoing, the juvenile court had before it sufficient evidence upon which it based its findings and conclusions. We conclude that the court properly applied Ind. Code § 31-34-12-4, and that its determination that C.K. was a CHINS under Ind. Code §§ 31-34-1-1 and -2 is supported by sufficient evidence.[2]

For the foregoing reasons, we affirm the juvenile court's determination.

Affirmed.

Robb, J., and Mathias, J., concur.

---

[2] To the extent Parents argue that the standard of review should be *prima facie* error because DCS has waived its arguments by failing to respond to their arguments, we find no merit in Parents' contention.