
FILED
Apr 09 2018, 6:01 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of K.P.G. (Minor Child), a Child in Need of Services, | April 9, 2018 |
| | Court of Appeals Case No. 49A05-1709-JC-2053 |
| K.P. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge |
| The Indiana Department of Child Services, | The Honorable Danielle Gaughan, Magistrate |
| *Appellee-Petitioner* | Trial Court Cause No. 49D09-1703-JC-891 |

**Crone, Judge.**

## Case Summary

[1] K.P. ("Mother") appeals a trial court order adjudicating her son, K.P.G., a child in need of services ("CHINS"). She asserts that the trial court lacked personal jurisdiction over her and K.P.G. and raises several other issues, all of which amount to a challenge to the sufficiency of the evidence to support the trial court's CHINS determination. Finding that she waived her jurisdiction challenge and that the evidence is sufficient to support the CHINS determination, we affirm.

## Facts and Procedural History

[2] On March 14, 2017, acting on a report of child neglect, Marion County Department of Child Services ("DCS")[1] sent family case manager ("FCM") Olivia Payne to the local bus station. There, Payne encountered Mother and eighteen-month-old K.P.G., who reportedly had been in the bus station all day without food. Payne attempted to speak to Mother, who was largely noncommunicative. She learned that Mother and K.P.G. (New Jersey residents) had been traveling from Iowa back to New Jersey, had missed their connecting bus, and had been in the Indianapolis bus station for nearly eighteen

---

[1] Mother has filed a motion to strike certain portions of DCS's brief as outside the record. *See* Appellee's Br. at 15 (paragraph 2 line 2, and footnotes 6 and 7). DCS filed an objection, pointing out that Mother had included the challenged information (affidavit and medical report) in her appendix and affirmed the accuracy of the appendix. We grant Mother's motion to strike, noting that the information was not part of the trial court record, and order that the information be stricken not only from DCS's brief but also from Mother's appendix. *See* Appellant's App. Vol. 2 at 56-61 (affidavit and accompanying medical report). That said, we note that our order to strike the information has no bearing on the ultimate outcome of this appeal.

hours. During the hour or so that Payne was with them, K.P.G. cried virtually the entire time, appeared unclean and tired, and looked like he did not feel well. Payne also noticed that each time K.P.G. tried to lean on Mother, Mother pushed him away. When Payne picked up K.P.G. to console him, he seemed feverish and was "breathing rapidly" and "really hard." Tr. Vol. 2 at 29. After observing a hospital band on his wrist, Payne took him to a local children's hospital, where he was evaluated and admitted. Mother said that a doctor in New Jersey had told her that K.P.G. had a heart murmur and that if a certain area did not close on its own, he would need surgery. She later testified that she did not want the New Jersey doctor performing surgery "cause I don't like surgery." *Id*. at 58.

[3] Shortly after K.P.G. was removed and hospitalized, Mother was admitted to the secured mental health unit at a different Indianapolis hospital. She reported that she suffered from mental illness, was trying to wean herself from her medication, and had not taken any medication for two months. She told FCM Carol Davis that she was from New Jersey and had been living with relatives there.

[4] On March 16, 2017, DCS filed a petition seeking to have K.P.G. adjudicated a CHINS. The trial court gave wardship of K.P.G. to DCS and ordered his placement in foster care (after hospitalization). Mother did not appear for the initial detention hearing, and the court ordered that she not have visitation with K.P.G. until she appeared in court. A week later, she appeared for the continued initial hearing, and pauper counsel entered an appearance on her

behalf. The next day, DCS amended the petition to include K.P.G.'s putative father. DCS sought an expedited interstate compact placement with New Jersey, which the trial court granted but which ultimately was not accepted by New Jersey.

K.P.G. remained hospitalized, and on June 6, 2017, DCS sought and was granted permission for K.P.G. to undergo surgery to repair his heart defect. That same day, Mother filed a memorandum of law, unaccompanied by a motion, alleging that the trial court lacked personal jurisdiction over Mother and K.P.G. On June 16, 2017, DCS filed an objection to Mother's memorandum, claiming that it was not properly filed, that Mother had appeared in person and by counsel, and that the trial court had found probable cause for the CHINS proceedings in March. The trial court never ruled on Mother's memorandum. Following the factfinding hearing on July 11, 2017, the trial court issued an order accompanied by findings of fact and conclusions thereon adjudicating K.P.G. a CHINS. One month later, the court held a dispositional hearing and issued a dispositional and parental participation order, for K.P.G. to remain in foster care and Mother to participate in services. Mother now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## Section 1 – Mother failed to properly contest the issue of personal jurisdiction and therefore has waived it for consideration on appeal.

Mother claims that the trial court lacked personal jurisdiction over her and K.P.G. because they are New Jersey residents who were present in Indiana merely because of a layover during a bus trip. "Personal jurisdiction refers to a court's power to impose judgment on a particular defendant." *Boyer v. Smith*, 42 N.E.3d 505, 509 (Ind. 2015). A challenge to personal jurisdiction is a question of law, which we review de novo. *Id.* at 508.

Indiana Trial Rule 12(B)(2) permits a party to raise lack of personal jurisdiction as a defense. "A party can waive lack of personal jurisdiction and submit himself to the jurisdiction of the court if he responds or appears and does not contest the lack of jurisdiction." *Heartland Res., Inc. v. Bedel*, 903 N.E.2d 1004, 1007 (Ind. Ct. App. 2009). Trial Rule 12(B) provides a mechanism for raising defenses such as a lack of jurisdiction or insufficient service of process by requiring that the defenses or objections be asserted in the responsive pleading (where one is required) or by motion. The rule further states,

> A motion making any of these defenses shall be made before pleading if a further pleading is permitted or within twenty [20] days after service of the prior pleading if none is required. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, any of the defenses in section (B)(2), (3), (4), (5) or (8) is waived to the extent constitutionally permissible unless made in a motion within

twenty [20] days after service of the prior pleading. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion.

[8] Here, Mother was not required to file a responsive pleading to the CHINS petition. As such, she had twenty days from the date of service of the petition to file a motion challenging personal jurisdiction. The chronological case summary shows the following: on March 16, 2017, DCS filed the CHINS petition; on March 24, 2017, Mother appeared before the trial court; on March 27, 2017, counsel entered an appearance on Mother's behalf; on March 28, 2017, DCS amended the CHINS position to include K.P.G.'s putative father; and on June 6, 2017, Mother submitted a memorandum (without an accompanying motion) raising for the first time the defense of lack of personal jurisdiction. Claiming that minimum contacts were lacking, Mother stressed in her memorandum that she and K.P.G. were just passing through Indiana and had never paid taxes, received government benefits, attended school, or resided in Indiana. Appellant's App. Vol. 2 at 79. Eighty-two days elapsed between the filing of the CHINS petition and Mother's submission of her memorandum first addressing the defense of lack of personal jurisdiction. More than seventy days elapsed from Mother's appearance in person and by counsel to the time of her personal jurisdiction memorandum and from the date of DCS's amended petition and Mother's memorandum. Simply put, Mother submitted herself to the trial court's jurisdiction by appearing in court and failing to contest personal jurisdiction at that time or within the time limitations found in Trial Rule 12(B).

As a result, she may not contest the issue on appeal. *See Heartland Res.*, 903 N.E.2d at 1007.

## Section 2 – The evidence is sufficient to support the CHINS determination.

Mother raises several arguments that essentially are challenges to the sufficiency of the evidence to support the CHINS determination. When reviewing the sufficiency of evidence, we give due regard to the trial court's ability to assess the credibility of witnesses. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* "Findings are clearly erroneous only when the record contains no evidence to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id.* at 1002.

In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re*

*N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).  To meet its burden of establishing

CHINS status, DCS must prove that the child is under age eighteen,

> (1)  the child's physical or mental condition is seriously impaired
> or seriously endangered as a result of the inability, refusal, or
> neglect of the child's parent, guardian, or custodian to supply
> the child with necessary food, clothing, shelter, medical care,
> education, or supervision; and
>
> (2)  the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the
>> coercive intervention of the court.

Ind. Code § 31-34-1-1.

[11]  Although the acts or omissions of one or both parents can cause a condition

that creates the need for court intervention, the CHINS designation focuses on

the condition of the children rather than on an act or omission of the parent(s).

*N.E.*, 919 N.E.2d at 105.  In other words, despite a "certain implication of

parental fault in many CHINS adjudications, the truth of the matter is that a

CHINS adjudication is simply that – a determination that a child is in need of

services." *Id.* (citations omitted).

[12]  Mother maintains that the trial court erred in concluding that K.P.G. has been

seriously impaired or endangered due to any inability, refusal, or neglect on her

part to provide him with necessities or adequate supervision absent the court's

coercive intervention.  She does not specifically challenge any of the court's

findings, and as such, we simply determine whether the unchallenged findings

are sufficient to support the judgment. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied.*

[13] The trial court's unchallenged findings of fact include the following:[2]

> 4. Mother and K.P.G. came to the attention of DCS in March of 2017 when DCS was called to investigate a report of Mother and K.P.G. being in the Indianapolis Greyhound Bus Station for approximately 18 hours after Mother had missed a bus to return back to New Jersey where her family, including her mother, lives. K.P.G. was wearing a hospital band and it was reported that he had not eaten all day and that Mother was not responsive to his needs.
>
> 5. When the DCS assessment worker arrived at the Greyhound bus station, she observed K.P.G. to be crying the whole first hour that she was there and Mother never tended to him. K.P.G. would lean up against Mother and Mother would bump him away with her arm. Additionally, K.P.G. felt warm to the touch, was breathing rapidly and was wearing a hospital band.
>
> 6. The police were called as well as DCS and Mother was taken to the secured mental health unit at Methodist Hospital and held for 72 hours. K.P.G. was taken to Riley Hospital because he appeared lethargic, was breathing rapidly and was wearing a hospital band.
>
> 7. When Mother was released from Methodist she contact[ed] DCS. DCS offered to refer mental health services but Mother declined. Mother stated that she "was grown and did not need help." DCS offered to refer home based case management to assist Mother with housing, transportation and to facilitate the

---

[2] The findings refer to K.P.G. by his first name. We refer to him by his initials.

treatment of mental health needs but Mother declined that service as well.

8.  K.P.G. has a heart condition and had heart surgery on June 23, 2017 and K.P.G. is currently hospitalized.

9.  At the time of the incident in the Greyhound Bus Station, Mother was aware that K.P.G. had a heart condition.

10.  By her own admission, Mother has "had mental illness for a while" and "is trying to wean" herself off of the medicine.

11.  Mother has not stayed in recent contact with DCS and DCS is not aware of where Mother is living.

12.  Mother has not seen K.P.G. since before his surgery on June 23, 2017.

13.  Throughout the trial Mother was very agitated, snorting at times, laughing, shaking her head and muttering to herself while others testified.  Mother's testimony was difficult to follow as Mother rambled and went off on tangents.  Mother frequently muttered, "desperate, how desperate" shaking her head.  On one occasion Mother randomly stated to the DCS attorney who was questioning her, "You got kids, I got kids. You got feelings, I got feelings."

l4.  The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. By her own admission, Mother has mental health issues and is not consistent with treatment and has been "weaning" herself off of the medication.  Mother was observed in the Greyhound Bus Station to be non-responsive to K.P.G.'s needs.  Mother had been in the bus station for quite some time and K.P.G. did not appear well.  Mother was observed in the courtroom today to be

agitated and talking to herself. Mother's responses to questions were rambling and non-responsive. Though there was no stated mental health diagnosis, Mother's behavior in Court during trial indicate[s] mental health issues that impair her ability to care for K.P.G., especially because of his young age and medical needs.

15. The child needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the Court. Mother needs mental health treatment so that she can appropriately care for her child and Mother lacks the insight into her mental health issues to seek treatment without the coercive intervention of the Court. K.P.G. has serious medical needs and the coercive intervention of the Court is necessary to ensure that K.P.G. receives the appropriate treatment.

Appellant's App. Vol. 2 at 102-04.

[14] Mother claims that the trial court's findings fail to support its conclusion that K.P.G. was endangered by her inability or unwillingness to provide him with care and treatment absent its coercive intervention. Emphasizing that she and K.P.G. were merely passing through Indiana, she relies heavily on our decision in *M.K. v. Indiana Department of Child Services*, 964 N.E.2d 240, 242 (Ind. Ct. App. 2012). There, we reversed a CHINS determination for three young children whose mother brought them to Indiana to look up relatives after smoke damage from a fire in their building had temporarily displaced them from their Maryland apartment. *Id*. at 245. There, we emphasized the unusual circumstances, which included not only the fire in an adjacent apartment but also a blizzard that resulted in their predawn arrival in Indiana, and the father's emergency trip to Texas to tend to his sick mother. *Id*. at 245-46. Both parents

were employed and had a savings account, and the mother had brought cash for food and lodging in Indiana. *Id*. She asked a police officer to take her and the children to an inexpensive motel, but the officer took them to a shelter instead. *Id*. at 246. The evidence simply did not support the trial court's finding that the mother had relocated to Indiana without a plan for housing and that she was unwilling or unable to provide the children with stable housing.

[15]    We find *M.K.* distinguishable. While both cases involved mothers and children who are not Indiana residents, the trial court's findings in *M.K.* emphasized a perceived housing deficiency as its basis for the CHINS adjudication, where the evidence showed that the mother in fact had cash and a plan for lodging, and that she had simply fallen prey to a "series of unfortunate and unforeseen events." *Id*. In contrast, here, the trial court based its decision on K.P.G.'s serious health problems and Mother's mental illness, both of which were unfortunate but not unforeseen. Mother knew that K.P.G. had a serious heart defect that would likely require surgery, yet she admitted that she had not consented to surgery in New Jersey because she did not like surgery. FCM Payne's astute and prompt response to K.P.G.'s labored breathing at the bus station resulted in his hospitalization, treatment, and eventual surgery. As for Mother's mental illness, she admitted that she was trying to wean herself from her prescribed medication and that she had not taken it for the two months preceding the CHINS proceedings. In short, her untreated mental illness left her unable to make critical decisions concerning K.P.G.'s care and treatment. FCM Payne's potentially lifesaving intervention underscores Mother's need for

the programs and services ordered by the CHINS court. Based on the foregoing, we conclude that the evidence is sufficient to support the CHINS determination. Accordingly, we affirm.

[16] Affirmed.

Bailey, J., and Brown, J., concur.