## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 24 2019, 7:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Talisha Griffin
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Matter of:

M.B. (Minor Child)

and

L.A. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

July 24, 2019

Court of Appeals Case No.
19A-JC-253

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Gael Deppert, Magistrate

Trial Court Cause No.
49D09-1810-JC-2638

*Guardian Ad Litem.*

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, L.A. (Mother), appeals the trial court's determination that her minor child, M.B. (Child), is a Child in Need of Services (CHINS).

We affirm.

# ISSUES

Mother presents us with two issues on appeal, which we restate as:

(1) Whether the trial court's findings are supported by the evidence; and

(2) Whether the trial court's conclusion that Child is a CHINS is clearly erroneous.

# FACTS AND PROCEDURAL HISTORY

[4] Child was born in April 2004 to Mother and R.B. (Father).[1] Mother became involved with child welfare authorities in December 2015 when she and Child were living in Illinois. Mother required short-term, in-patient care to address her mental health, and Child was placed in foster care. Child was returned to Mother in April 2016, and the case was closed in March 2017. By that time, Mother and Child were living in public housing in Illinois. In May 2017, Mother was evicted from her public housing due to her failure to recertify to maintain her placement. She and Child became homeless and lived in a series of shelters as Mother relocated to Anderson, Indiana, and Lexington, Kentucky. By the spring of 2018, Mother and Child were in Cincinnati, Ohio, where they lived in a bus station for approximately two weeks. Mother and Child were kicked out of the bus station during the day, so Child slept on a bench. Child was arrested at the bus station for an offense, the nature of which is not clear from the record. Thereafter, Mother and Child moved to Indianapolis, where Mother placed Child in a series of respite care programs. Mother resided in shelters, and when she reached her time limit at a shelter, she stayed with friends because she "didn't have any other option." (Transcript p. 22).

---

[1] Father is not a party to this appeal.

[5]     By June 2018, Child could no longer reside at his last respite care placement, and the Department of Child Services (DCS) was alerted. Child was placed in foster care. A CHINS proceeding was instigated which was dismissed because a hearing was not held within the statutorily-mandated timeframe. On October 23, 2018, after the CHINS was dismissed, the trial court ordered Child to be returned to Mother's care. On October 24, 2018, Mother appeared at Child's school seeking to take Child with her. After confirming that Mother was allowed to take Child, the school social worker removed Child from class. Child refused to go with Mother, which bothered Mother. Due to Child's refusal to go with Mother, Child's school social worker alerted DCS.

[6]     On October 25, 2018, the trial court granted DCS's request to file a petition alleging that Child was a CHINS because Mother had failed to provide safe, stable housing for Child, Mother's unemployment and housing instability demonstrated an inability to provide Child with basic care and necessities, and Mother had failed to take Child back into her care after the previous CHINS had been resolved in her favor. Child was placed in foster care. As part of its provisional orders, the trial court ordered supervised parenting time for Mother.

[7]     On December 11, 2018, the trial court conducted a fact-finding hearing on the CHINS petition. At the time of the hearing, Mother resided at the Wheeler Mission. Mother was on a waiting list for HIP housing, but she had not secured any other housing for the family. Her plan for Child's housing if he were returned to her was to place him in a housing program where they could have increased contact. Mother acknowledged at the hearing that housing

instability, along with other factors, had impacted Child's mental health. Mother claimed to have received three offers of employment, but she had not been employed since July 2017. Mother had been diagnosed with PTSD and an anxiety disorder. Mother was prescribed medication for her mental health diagnoses which she was no longer taking. Family Case Manager Jonathan Bush (FCM Bush), who had been with the family since the inception of the first CHINS, testified that Mother had not presented him with any records indicating that she had been released by a physician from her medications.

[8] When Mother testified at the fact-finding hearing, she left the witness stand multiple times to hand documents directly to attorneys in the courtroom. Eventually, the trial court requested that she remain seated during her testimony. At times Mother continued to talk despite her counsel's admonishment to cease offering testimony without a question before her. Mother spoke out during the testimony of other witnesses, and she commented negatively when testimony was unfavorable to her, despite the requests of her counsel to stop.

[9] FCM Bush had observed throughout his dealings with Mother that, when she was frustrated or angry, Mother would stop the conversation, walk out, or blame others for her situation. Mother had twice left hearings in this matter before court was adjourned. Approximately two weeks before the fact-finding hearing, Mother was referred to services by DCS to address her housing and employment issues. Mother had not reached out to the provider to seek assistance, and she did not respond when the service provider contacted her to

arrange meetings. Mother had not had parenting time due to her failure to respond in a timely manner to the facilitator and due to Child's lack of desire to meet with Mother until she was stabilized. FCM Bush recommended Child's continued placement outside Mother's care. He also recommended that Mother receive homebased services to address her housing and employment issues and that Mother undergo a psychiatric evaluation.

[10] Child testified at the fact-finding hearing that he thought that it was important to have stable housing because "when you're stable you can focus, you can do more, you can have . . . well, you can have your own life more essentially th[a]n when you're not stable cause when you're not stable you gotta worry about more." (Tr. p. 56). Child remembered a time in his life when Mother had stable housing for them and noted that conditions for the family had changed significantly since 2013. Child recognized that Mother at times experienced "random outbursts" and that she had walked out of court twice. (Tr. p. 58). Child, who was fourteen years old at the time of the fact-finding, did not wish to return to Mother's care until she had achieved some stability.

[11] On December 23, 2018, the trial court issued an order declaring Child a CHINS in which it made the following relevant findings of fact and conclusions of law:

> 8. Sometime prior to 4/15/16, and for an unknown period of time, [Child] had been placed in foster care through an open child welfare case in Illinois on the basis of mother's mental health concerns. [Child] returned to her care 4/15/16; the Illinois case closed 3/29/17 after about fifteen months of a supervision plan.

9. [Mother] is diagnosed primarily with Post Traumatic Stress Disorder and anxiety disorder, and is not currently medicated but with no medical documentation to support [Mother] being off medications for her mental health and well-being. Prior to the fact-finding, [Mother] found a new provider from IU Health, Ms. Jan Rheinhart for counseling, and [Mother] hopes for family counseling to occur with [Child] because "of the amount of time my son has been in foster care."

10. [Mother] and [Child] left Illinois after they were "forcefully evicted" from public housing in Illinois for "failure to recertify."

11. At the time of the fact-finding 12/11/18, [Mother] has resided in a homeless shelter in Indianapolis, Indiana, "off and on" for the past six to seven months, otherwise staying with friends, and with "no other option" available to [M]other regarding housing for herself.

12. Prior to living in a homeless shelter in Indianapolis, Mother and [Child] lived in a domestic violence shelter in Lexington, Kentucky, where they lived for seven to eight months to ten [sic] months.

13. Prior to living in a domestic shelter in Lexington, Kentucky, [Mother] and [Child] lived in a domestic violence shelter in Anderson, Indiana, because, [M]other states, "there are domestic violence issues with regard to [Father]."

14. [Mother] and [Child] have slept in a bus station for a couple weeks when [Mother] and [Child] left Kentucky for [Mother] to interview for a "logistics account executive position" in Cincinnati, Ohio.

15. [Mother] has accepted a couple job offers from different companies since leaving Anderson, Indiana, but she has never received a start date from any of the companies.

16. In late April 2018, [Mother] found respite care for [Child] with the Children's Bureau, as there was no room for him to stay with [M]other in a local shelter in Indianapolis, Indiana. Because of time restrictions with the respect [sic] care program, [Mother] relocated [Child] to a Safe Families program in Indianapolis, Indiana, from early May 2018 to early to mid-June 2018. [Mother] then arranged for [Child] to stay at StopOver program in Indianapolis, Indiana, for [Child] to receive counseling services [Mother] thought [Child] needed and which StopOver made available.

17. [Child] has been placed in foster care through 49D09-1806-JC-001620, and in the same foster care placement through CHINS cause, above, where he is thriving; [Child] requests his continued placement there until [Mother] "get(s) (herself) together."

18. Homemaker aid services are in place for [Mother] through this CHINS cause, above, but [Mother] has not responded to the service providers' texts about where or when [Mother] can meet. [Mother] has not reached out in any communication with the homemaker aid service provider for housing or employment assistance.

19. At the time of the filing of the petition 10/24/18, and at the time of the CHINS fact-finding 12/11/18, [Mother] has no stable housing and is without employment to care for [Child] and provide basic necessities for [Child].

* * * *

21. [Child] has refused to participate in any parenting time with [Mother] or [Father] through the duration of this CHINS cause, above, as he wants [M]other "to be stable" before he is reunified with her so that he does not have to be uprooted again.

22. [Mother's] conduct during proceedings in this CHINS cause, above, calls into question her mental well[-]being:  At the fact-finding 12/11/18, [Mother] left the witness stand a couple times, with the record running, despite admonishment by her attorney, to retrieve paperwork; without prompting, [Mother] reached over the witness stand at different points in the fact-finding to hand papers to the DCS attorney; [Mother] left the courtroom prior to conclusion of the [c]ourt's hearing on two prior and separate occasions despite admonishment by the [c]ourt; the [FCM Bush] reports that he has observed on more than one occasion [Mother] speaking to herself, in the presence of no one.

(Appellant's App. Vol. II, pp. 95-97).  The trial court concluded that Child was endangered by Mother's inability to maintain employment and stable housing and that Mother's mental health contributed to that inability.  The trial court found that Child needed stable housing and "other necessary requirements" that he was not receiving due to Mother's inability to sustain housing, employment, and her mental health.  The trial court concluded that Child was unlikely to have those needs met without the coercive intervention of the court.

[12]  Mother now appeals.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I.  *Standard of Review*

Mother challenges the evidence supporting the trial court's findings of fact and its ultimate conclusion that Child is a CHINS.  Our standard of review of a trial court's CHINS determination is well-settled: we do not reweigh the evidence or judge witness credibility.  *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 577-78 (Ind. 2017).  We consider only the evidence which supports the trial court's decision and the reasonable inferences to be drawn from that evidence.  *Id*. at 578.  In addition, where, as here, the trial court has entered findings of fact and conclusions of law, we exercise a two-tiered review.  *Matter of K.P.G.*, 99 N.E.3d 677, 681 (Ind. Ct. App. 2018), *trans. denied*.  First, we consider whether the evidence supports the findings, and, second, we determine whether the findings support the judgment.  *Id*.  We will reverse a trial court's CHINS determination only if it is clearly erroneous and a review of the record leaves us firmly convinced that a mistake was made.  *Id*.  A CHINS determination is clearly erroneous "if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts."  *In re D.J.*, 68 N.E.3d at 578 (internal quotation marks omitted).

## II.  *Findings of Fact*

The trial court entered twenty-two findings of fact in its CHINS order.  Mother challenges the evidence supporting the following three findings:

7. [Child] refused to return to the custody of [Mother] on 10/23/18 because he did not want to go with her if she did not have stable housing to provide him.

11. At the time of the fact-finding 12/11/18, [Mother] has resided in a homeless shelter in Indianapolis, Indiana, "off and on" for the past six to seven months, otherwise staying with friends, and with "no other option" available to [M]other regarding housing for herself.

22. [Mother's] conduct during proceedings in this CHINS cause, above, calls into question her mental well[-]being . . . .

(Appellant's App. Vol. II, pp. 95-97).

[15] Mother argues that finding 7 is unsupported by the evidence because the date of the incident was October 24, 2018, and not October 23, 2018, as found by the trial court. However, Child's school social worker testified that the incident took place on October 23, 2018, and so, contrary to Mother's argument, there is evidence in the record supporting the trial court's finding that Child refused to go with her on October 23, 2018. In support of her claim otherwise, Mother cites a portion of the fact-finding hearing wherein Mother spoke out during the social worker's testimony to contradict her. Even if the trial court had mistakenly found the date of the incident to be October 23, 2018, the date of the incident does not alter the substance of the finding, and Mother does not explain how she was prejudiced by the claimed error.

[16] Mother's claim as to finding 11 is that she testified at the fact-finding hearing that she had recently started working on her permanent housing plan and that

she was working with HIP to procure housing. In light of this testimony, she argues that the trial court's finding that she had no other housing options available to her was clearly erroneous. Mother's argument misapprehends the nature of the trial court's finding which was based on her housing history over the previous seven months, not her chances of future housing. Mother's own testimony showed that she had been living in shelters and that when her time limit was up at a shelter, she stayed with friends because she had "no other option." (Tr. p. 22). Although she may have recently undertaken new efforts to procure permanent housing, at the time of the fact-finding hearing, none of those options had materialized. Therefore, this finding was also supported by the evidence.

[17]    As to finding 22, Mother argues that her behavior in court has "no correlation in determining whether her mental health is sound." (Appellant's Br. at 13). Mother does not challenge the accuracy of the trial court's findings regarding her specific conduct; rather, she maintains that those acts do not reflect upon her mental health. However, Mother's acts of leaving the witness stand after being directed not to by her attorney, handing documents to the DCS attorney directly, and leaving the courtroom before hearings were adjourned demonstrated poor impulse control on Mother's part, which does implicate her mental health. The trial court reasonably inferred from Mother's conduct that she may have mental health issues to address. Pursuant to our standard of review, we do not second guess such reasonable inferences by the trial court. *See In re D.J.*, 68 N.E.3d at 578.

Mother's challenge to the trial court's finding as part of finding 22 that FCM Bush observed Mother talking to herself is equally unavailing. FCM Bush testified that he had observed Mother talking to herself when no one else was around, and, therefore, this finding was supported by the evidence and is not clearly erroneous. *See id*. Mother directs our attention to FCM Bush's testimony that he assumed that, when he saw her talking to herself, she was practicing what to say in court, but this is evidence that does not support the trial court's determination, and, pursuant to our standard of review, we do not consider it. *Id*.

## II. *Conclusions of Law*

Mother also asserts that the trial court's conclusions of law are unsupported by the evidence. We begin by noting that "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). In order to meet its burden to establish that a child is a CHINS, the State is required to show that a child is under the age of eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. Thus, the statute requires that the State prove "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. The State is required to make this showing by a preponderance of the evidence. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*.

### A.  *Endangerment*

[20] Mother first argues that the State failed to prove that Child was endangered. The purpose of the CHINS statute is to protect children. *In re C.K.*, 70 N.E.3d 359, 364 (Ind. Ct. App. 2016), *trans. denied*. The paramount interest in a CHINS proceeding is the best interest of the child, not the guilt or innocence of the parents. *See Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). While the CHINS statute requires that the State show that a child is seriously endangered, it does not require that a court wait until tragedy has occurred before intervening. *In re C.K.,* 70 N.E.3d at 364. Rather, a child is a CHINS when he is endangered by a parent's action or inaction. *In re S.D.*, 2 N.E.3d at 1287.

[21] The trial court determined that Child was endangered by three main factors—housing instability, Mother's unemployment which rendered her unable to provide housing and basic necessities, and Mother's mental health. The State showed that the family had not had stable housing since being evicted from their public housing in Illinois in May 2017. Thereafter, Mother and Child

lived in a series of shelters as Mother relocated to Anderson, Lexington, and Cincinnati. Just before arriving in Indianapolis, Mother and Child lived in a bus station for two weeks where Child was arrested and, at times, was forced to sleep on the street. Upon arrival in Indianapolis, Mother placed Child in a series of temporary respite care programs while she stayed at a shelter and with friends. Although Mother had placed her name on a waiting list for permanent housing, as of the time of the fact-finding hearing, she had not procured stable housing for Child. Her plan, if Child were returned to her, was to place Child in another housing program where he would continue to be out of her care. Child testified that he felt less secure when he lived in shelters, and he did not wish to return to Mother's care until he had a stable place to live with her. The trial court reasonably concluded from this evidence that Child's physical and mental health were endangered by Mother's inability to procure stable housing.

[22]   In addition, Mother had been unemployed since July 2017. There was no evidence in the record that Mother or Child received any other form of income or food benefit. The reasonable inference to be made from these facts is that Child's other basic needs, such as food and clothing, were being met from other sources apart from Mother. Although Mother's efforts in accessing resources was commendable, the fact remains that for an extended period of time she herself was not providing Child with his basic needs, and she had essentially already placed Child outside of her care. Evidence of Mother's poor impulse control, as manifested by her behavior in court and in her dealings with FCM Bush, and her untreated PTSD and anxiety disorder supported the trial court's

conclusion that her mental health contributed to her inability to obtain employment, despite a number of claimed job offers.

[23] On appeal, Mother argues that she did not endanger Child because she consistently looked for stable housing and employment and was successful at meeting Child's needs, despite having no home or employment. In support of that argument, Mother relies on *In re S.M.*, 45 N.E.3d 1252, 1255-56 (Ind. Ct. App. 2015), wherein this court noted that the mere fact that a parent is unemployed or the mere fact that a family is living in a shelter does not *de facto* make a child a CHINS, where the record is devoid of evidence of a child's needs going unmet. In that case, the State alleged that the children were CHINS primarily because the meconium of Mother's newest child had tested positive for marijuana. *Id*. at 1256. We found that the State had failed to prove that the children were CHINS despite evidence of Mother's marijuana use where the evidence also showed that the children always had a home, sufficient food, and sufficient clothing. *Id*.

[24] We find that this case is distinguishable from *In re S.M.* in that Child has not always had a home or even a place in a shelter when he was in Mother's care. Mother was not simply unemployed, nor was she simply temporarily unable to provide housing for child. Child's case represents a confluence of long-term housing instability, unemployment, and untreated mental health diagnoses which, together, supported a reasonable conclusion that Child was endangered sufficient to find him to be a CHINS. Mother's argument that Child testified

that he did not feel endangered is simply an invitation for us to reweigh the evidence of the case, which we will not do. *See In re D.J.*, 68 N.E.3d at 577-78.

## B. *Coercive Intervention*

[25] Mother also argues that the trial court's determination that Child required the coercive intervention of the State to have his needs met was not supported by the evidence. Mother's main contention on this issue is that the evidence reflected her success at accessing housing and basic necessities for Child through programs without the State's intervention. However, despite these efforts, the evidence showed that Mother did not secure stable housing or independently provide basic necessities for Child for over a year, Child was unwilling to reside with her in shelters, and that her plan for Child if he were not declared a CHINS was to place him in yet another housing program outside of her care. Mother had been referred to services in the previous CHINS with which she was not compliant at the time that CHINS proceeding was dismissed, and she had not complied with the services referred to her in the instant CHINS proceedings to address her housing instability and unemployment. Mother had also apparently ceased taking her medication without physician approval, which indicates that she will not address her mental health without State intervention. In light of this evidence, we conclude that the trial court's conclusions that Child was endangered and had needs which would not be met without the coercive intervention of the State were not clearly erroneous. *See id*. at 578.

# CONCLUSION

Based on the foregoing, we conclude that the trial court's findings were supported by the evidence and that its conclusion that Child was a CHINS was not clearly erroneous.

Affirmed.

Bailey, J. and Pyle, J. concur