# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 11 2020, 8:55 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF:

K.S. (Minor Child)

*A Child in Need of Services*

and

A.H. (Father),

*Appellant-Respondent*

v.

The Indiana Department of Child Services

*Appellee-Petitioner*

and

June 11, 2020

Court of Appeals Case No.
19A-JC-2957

Appeal from the Marion Superior Court Juvenile Division

The Honorable Mark A. Jones, Judge

Honorable Beth Jansen, Magistrate

Trial Court Cause No.
49D15-1906-JC-1590

Child Advocates, Inc.,

*Appellee-Guardian ad Litem*

**Altice, Judge.**

## Case Summary

A.H. (Father) appeals the trial court's adjudication of his infant child K.S. (Child) as a Child in Need of Services (CHINS).

We affirm.

## Facts & Procedural History

Child was born to L.S. (Mother) on May 25, 2019. Mother, who suffered from untreated mental illness and substance abuse, became overwhelmed caring for Child. On June 18, 2019, Mother took Child to a well check and made statements to medical staff that prompted an immediate report to the Indiana Department of Child Services (DCS).

Bailey Sandlin, a DCS assessment worker, responded to Methodist Hospital that same day and interviewed Mother, who was at the hospital with Child. Mother reported to Sandlin that she felt stressed and overwhelmed, especially at

night with Child. Mother also reported a history of mental illness for which she was not currently receiving treatment. Of particular note, Mother indicated that she had had thoughts of harming Child by either holding her hand over Child's mouth and nose or throwing her to the ground. Mother also acknowledged a history of substance abuse, including methamphetamine.

[5] Mother reported two potential fathers for Child, Father and A.L. Sandlin interviewed both men at the hospital that day. Father told Sandlin that he was not sure that he was Child's father, that he had other children, and that he was not sure what his involvement was going to be with Child. Father submitted to a drug screen, the results of which were never admitted into evidence at the CHINS hearing, but Sandlin testified that she had substance abuse concerns related to Father at the time.

[6] On the evening of June 18, 2019, as a result of her assessment, Sandlin took Child into emergency custody. Child was placed in relative care with Mother's aunt (Aunt). Sandlin then filed a CHINS petition.

[7] Father did not appear at the initial hearing on June 21, 2019, where the court determined that Child should remain with Aunt. On July 10, 2019, Father and A.L. (the other potential father) appeared for the continued initial hearing. The court appointed counsel for the men and ordered them to submit to DNA testing to determine paternity. On July 25, 2019, Father was determined to be Child's biological father, and A.L. was dismissed from the case.

[8] At a pretrial hearing on July 31, 2019, the parties requested mediation, which the court ordered. Additionally, the court authorized Aunt to supervise parenting time for Father. Father visited with Child twice after this date, with the last visit in mid-September. Neither Mother nor Father appeared for the mediation on September 4, 2019.

[9] In the meantime, Mother was charged with possession of cocaine on August 26, 2019, and then prostitution on September 11, 2019. She failed to appear for a hearing in the former criminal case and was arrested and held in jail for most of September until bonding out near the end of the month.

[10] Mother did not appear for the CHINS factfinding hearing on October 2, 2019, which was rescheduled for two weeks out due to her absence. Father was present with appointed counsel and expressly did not object to the continuance.

[11] The factfinding took place on October 16, 2019. Mother again did not appear. Her counsel's request to withdraw was granted by the court. Father also did not appear, and his counsel did not know Father's whereabouts and had been unable to reach him. The court denied a request for another continuance.

[12] Bailey Sandlin testified regarding her initial investigation as outlined above. Three service providers referred for Mother then testified, indicating that Mother had not complied with services since August. Specifically, Mother's homebased caseworker Dekkia Thomas testified that Mother had been noncompliant with homebased services since early August, was a no show for a scheduled psychological evaluation, and had reported to Thomas that she was

"fed up with everything" and did not care to reunify with Child. *Transcript* at 26. Further, the visitation facilitator testified that Mother had not visited Child since August and came to a visit "irate" and "appeared [to be] high." *Id*. at 28. Mother did not have a permanent residence.

[13] Aunt testified regarding both Mother and Father. She noted Mother's drug use and indicated that she feared for Child's safety with Mother. Aunt had last seen Mother in August when Mother came to a visit "high, very loud abusive [sic] to Aunt and the visiting coordinator." *Id*. at 30. With respect to Father, Aunt testified that Mother and Father had previously dated for about a year. Father had visited Child only twice, with the most recent visit being about a month before the factfinding hearing. Aunt indicated that he was attentive and appropriate with Child, but she was concerned about him "financially and stability wise." *Id*. Father had informed Aunt that "his income right now is a mess" and "he's going from job to job." *Id*. at 31. Father told Aunt that he was trying to become a commercial truck driver, which would require him to be away from home and Child for three out of four weeks each month. He asked Aunt if she would be willing to keep Child when he was on the road.

[14] DCS family case manager (FCM) Kimberly Martin, who took over the case on October 4, 2019, testified that she had been unable to reach Father despite calling him at least five times since that time. He never returned her calls and she did not have an address for him, so FCM Martin was unable to determine Father's housing, employment, or financial situation. FCM Martin testified that she had seen a report indicating Father had used cocaine, but she

acknowledged that his recent drug screen showed nothing that concerned her regarding his sobriety.

[15] Based on the evidence presented at the hearing, the trial court adjudicated Child a CHINS and set the matter for disposition. Father (as well as Mother) did not appear at the scheduled dispositional hearing on November 13, 2019, so the court reset the hearing for a week later. Still, Father (and Mother) did not appear on November 20, 2019. Father's counsel indicated that Father was at work. With respect to Father, DCS asked the court to order completion of a Father Engagement Program and random drug screens. Father's counsel agreed that those services would be appropriate and asked for increased parenting time. With respect to parenting time, the GAL indicated that Father had only visited Child twice in the last five months and, thus, recommended supervised visits. Additionally, FCM Martin noted that she had still been unable to reach Father. Ultimately, the court ordered the agreed-upon services for Father, authorized increased parenting time upon the recommendation of the treatment team, and ordered DCS to make an effort to conduct a home study with Father's assistance. Child remained in relative care.

[16] Father now appeals, arguing that DCS failed to prove that Child was a CHINS pursuant to Ind. Code § 31-34-1-1. Additional information will be provided below as needed.

## Discussion & Decision

[17] DCS bears the burden of proving that a child is a CHINS by a preponderance of the evidence. *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), *clarified on reh'g*, 27 N.E.3d 287 (2015), *trans. denied*. On review of a CHINS determination, we do not reweigh the evidence or assess witness credibility. *Id*. Rather, we consider only the evidence in favor of the trial court's judgment and all reasonable inferences derived from that evidence. *Id*.

[18] Where the trial court enters findings of fact and conclusions, as in this case, we apply a two-tiered standard of review, first considering whether the evidence supports the factual findings and then whether those findings support the judgment. *Id*. "We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made." *Matter of K.P.G.*, 99 N.E.3d 677, 681-82 (Ind. Ct. App. 2018), *trans. denied*. Findings are clearly erroneous only when the record contains no evidence to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*. at 682.

[19] To meet its burden of establishing Child's CHINS status, DCS was required to prove by a preponderance of the evidence:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent … to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) when the parent … is financially able to do so; or

> (B) due to the failure, refusal, or inability of the parent …
> to seek financial or other reasonable means to do so; and

> (2) the child needs care, treatment, or rehabilitation that:

> > (A) the child is not receiving; and

> > (B) is unlikely to be provided or accepted without the
> > coercive intervention of the court.

I.C. § 31-34-1-1. In sum, I.C. § 31-34-1-1 "requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[20] Our Supreme Court has explained:

> [A] CHINS determination establishes the status of a child alone. Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage. … [T]he conduct of one parent can be enough for a child to be adjudicated a CHINS. Indeed, to adjudicate culpability on the part of each individual parent in a CHINS proceeding would be at variance with the purpose of the CHINS inquiry: determining whether a child's circumstances necessitate services that are unlikely to be provided without the coercive intervention of the court. Said differently, the purpose of a CHINS adjudication is to protect children, not punish parents. The resolution of a juvenile proceeding focuses on the best interests of the child, rather than guilt or innocence as in a criminal proceeding.

*In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) (citations omitted); *see also K.P.G.*, 99 N.E.3d at 682 ("Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s).").

[21] Here, DCS established that prior to removal, Child was in the care of Mother who was suffering from untreated mental illness and was overwhelmed caring for Child. Mother reported thoughts of harming Child by suffocation or by throwing her to the ground. Additionally, Mother has a history of substance abuse and was arrested and criminally charged twice during the underlying proceedings. Aside from the first month or so following Child's removal, Mother has not participated in services and she failed to appear for the September mediation or any subsequent CHINS hearings, including the factfinding hearing in October and dispositional hearing in November.

[22] Though a tad more involved in the CHINS matter, Father similarly failed to appear for the mediation, factfinding hearing, and dispositional hearing. He also did not return any of the numerous calls made to him by FCM Martin, who had only a phone number for him and no address. By the time of the factfinding hearing (and the subsequent dispositional hearing), Father had only visited with Child twice. He was loving and appropriate with Child but expressed to Aunt serious concerns regarding his current financial stability. Instead of continuing to jump from job to job, Father told Aunt that he was

trying to become a commercial truck driver, which would require him to be on the road for three out of four weeks each month.

[23] On appeal, Father challenges portions of two of the trial court's findings. First, at the end of Finding #8, the trial court indicated that Sandlin, during her initial assessment, "had concerns about [Father's] drug use." *Appendix* at 138. This finding is supported by the evidence, as Sandlin expressed this general concern during her testimony. Moreover, we observe that the court made no findings regarding actual drug use by Father. In fact, in Finding #16, the trial court found that Mother needed, among other services, drug screens and that Father required only homebased casework.

[24] Father also challenges the portion highlighted below of Finding #14:

> [Aunt] is the relative care giver for this child. [Aunt] states that the Mother is currently abusing drugs and she lacks the patience necessary to properly parent the child. [Aunt] has concerns for the safety of the child if placed in the care of Mother. *[Aunt] knows [Father] and she knows that financially he cannot provide for this child.* [Aunt] and [Father] have talked about the child remaining in her care while [Father] was on the road. [Father] last saw the child about one month ago and although he was appropriate during visits, his absence today is problematic.

*Id*. (emphasis supplied). Aunt testified that she knew Father and that he had discussed his financial situation with her. Based on these discussions, Aunt expressed concern regarding Father's financial stability and testified that Father's "income right now is a mess" and that "he's going from job to job."

*Transcript* at 31. In light of Aunt's testimony regarding Father's current financial stability, we cannot say that the court's finding is clearly erroneous.

[25] The facts and circumstances before the trial court amply established that Child is a CHINS. Indeed, on appeal, Father does not dispute that Child was seriously endangered while in Mother's care or that Mother is unlikely to provide Child's needed care without court intervention. Father, rather, suggests that he can provide the care Child needs and do so without court intervention. We certainly hope that Father can do so in the near future, but the evidence establishes that this is not yet the case. As outlined above, Father had (1) visited Child only twice during the CHINS proceedings and expressed significant financial instability to Aunt during those visits, (2) not responded to calls from FCM Martin, making it difficult for her to assess his current ability to care for Child, and (3) not attended the factfinding hearing (or the prior court-ordered mediation or the subsequent dispositional hearing). DCS established by a preponderance of the evidence that Father is unlikely to meet Child's needs absent coercive court intervention.[1]

---

[1] Father's attempt to liken this case to *S.A.*, 15 N.E.3d 602, is unavailing. In *S.A.*, the father had been absent for the first two years of his child's life while serving active duty in the United States Navy. When the child was almost two years old, a CHINS petition was filed due to the mother's drug use and neglect. Thereafter, the father established paternity and, after being discharged from the Navy later that month, moved back to Indiana, found employment and housing, contacted DCS and the CASA, and visited his child daily. The father also attended a child and family team meeting with DCS before the factfinding hearing. The father testified at the factfinding hearing and expressed an ability and desire to parent his child. Based on the evidence, this court reversed the CHINS adjudication because DCS had failed to establish that the father was not likely to meet his child's needs absent coercive court intervention. Unlike the father in *S.A.*, Father's actions throughout the CHINS case, including his lack of communication with DCS and his failure to attend

Judgment affirmed.

Bailey, J. and Crone, J., concur.

---

the factfinding hearing, demonstrate an inability or unwillingness to care for Child and provide for Child's needs without the coercive intervention of the court.