# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 14 2020, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT (MOTHER)

Danielle L. Gregory
Indianapolis, Indiana

APPELLANT PRO SE (FATHER)

C.T.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika P. Talbot
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

Dede K. Connor
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

E.W., J.F., and A.W. (Minor Children)

And

S.W. (Mother),

And

C.T. (Father),

*Appellants-Respondents,*

v.

February 14, 2020

Court of Appeals Case No.
19A-JC-1881

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Rosanne Ang, Magistrate

Trial Court Cause Nos.
49D15-1812-JC-3119, 49D15-1812-JC-3120, and 49D15-1812-JC-3121

The Indiana Department of
Child Services,

*Appellee-Petitioner*

And

Child Advocates, Inc.,

*Appellee-Guardian ad Litem.*

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Respondents, S.W. (Mother) and C.T. (Father) (collectively, Parents), appeal the trial court's Order declaring minor children E.W., J.F., and A.W. (collectively, the Children) to be Children in Need of Services (CHINS).

We affirm.

# ISSUES

Parents present this court with seven issues between their respective Briefs, which we consolidate and restate as the following four issues:

> (1) Whether Father has waived several of his claims for our review;
>
> (2) Whether Father's Fourth Amendment rights were violated by the entry of a Department of Child Services (DCS) employee into Mother's home to conduct an investigation;

(3) Whether DCS and the trial court violated CHINS procedural statutes; and

(4) Whether the trial court's Order declaring the Children to be CHINS was supported by the evidence.

## FACTS AND PROCEDURAL HISTORY

Mother is the mother of E.W., born July 28, 2001, J.F., born July 20, 2011, and A.W., born April 22, 2015. Father is the father of A.W.[1] Prior to the instant proceedings, Mother had been interviewed by DCS in August 2, 2018, in response to a report of domestic violence involving Father. Mother reported that she had sought the assistance of law enforcement on several occasions due to violence with Father and that she had kicked Father out of her home for the same reason. DCS did not act further at that time because Mother indicated that Father would no longer be present in the home and that she would no longer be in a relationship with him.

By November 2018, Mother, Father, and the Children were still residing together in Mother's home in Indianapolis, Indiana. On November 12, 2018, Mother called 9-1-1 and reported that Father would not leave her home, he was coming down from being high, and he was hurting E.W. Mother was overwhelmed and emotional. On November 13, 2018, DCS Family Case Manager Jamica Tucker (FCM Tucker) investigated a report that the Children

---

[1] The trial court declared all of the Children to be CHINS. E.W.'s father is deceased. J.F.'s father does not participate in this appeal.

were victims of neglect due to domestic violence. FCM Tucker went to the home to interview Parents, but they refused to cooperate in an investigation. FCM Tucker subsequently filed a motion to compel Parents to engage in the investigation, after which, on December 14, 2018, Mother agreed to an interview. Mother confirmed that there had been a physical altercation between her and Father in November and that Father had choked her until E.W. intervened. Father was present and denied Mother's report. Parents would not sign the safety plan offered by FCM Tucker, so she reviewed the plan with them orally. Part of the safety plan was for Parents to refrain from further domestic violence. FCM Tucker subsequently prepared an initial recommendation that a CHINS petition be filed but that the Children be kept in-home, subject to Parents' signing a safety plan and participating in a domestic violence assessment and home-based casework. Parents did not engage in services or cooperate with DCS.

[6] On December 27, 2018, DCS filed a CHINS petition alleging that the Children were endangered due to Parents' failure to provide them with a home that was free from domestic violence. Later the same day, the trial court held a combined initial hearing and detention hearing which both Parents attended. The trial court found probable cause that the Children were CHINS and removal of the Children was necessary to ensure their safety. The Children

were placed in foster care.[2]  On January 7, 2019, the family's permanency caseworker received emails from Father indicating that Mother had borderline personality disorder, Mother was abusive, Mother's behavior was worsening, and that Father needed to be in the home to protect the Children from Mother.

[7]  On March 20, 2019, the trial court held the first of two fact-finding hearings on the CHINS petition.  Parents traveled to the hearing together.  Father denied that he had ever engaged in any physical violence with Mother.  Father also denied sending the January 7, 2019, emails about Mother to the permanency caseworker.  Mother denied reporting previous incidents of violence with Father, denied that the November 12, 2018, incident occurred, and denied telling FCM Tucker that the November 12, 2018, incident occurred.

[8]  Mother's previous home-based therapist testified that Mother had reported that Father was verbally and emotionally abusive.  Mother's therapist believed that Mother had a pattern of engaging in abusive relationships, she would benefit from domestic violence education, and that Parents' cohabitation presented safety concerns.  Mother's therapist expressed concern that Parents had arrived for the hearing together because she felt that a victim needs to modify behavior and separate from an abuser.  Mother's second home-based therapist testified

---

[2]  On April 24, 2019, J.F. and A.W. were placed together with their maternal grandmother, where they resided until disposition.  E.W. turned eighteen years old on July 28, 2019.

that, as of the end of February 2019 when their working relationship began, Mother denied ever having experienced domestic violence.

[9] At the April 24, 2019, second fact-finding hearing, it was revealed that on March 26, 2019, Mother had contacted her parenting time supervisor and reported that Father had attacked her. Father had come to Mother's home, and Mother let him in. The two began arguing, and Father initiated a physical altercation. The parenting time supervisor rushed to Mother's home to await the arrival of police. The supervisor observed that "[t]he living room was a mess, it looked like someone destroyed the living room." (Transcript Vol. II, p. 171). Mother reported having pain in her neck following the altercation. By the time of the second hearing, Mother had not completed her domestic violence services, although Mother expressed a willingness to complete the services at her own expense. Mother admitted that it is damaging to children to be exposed to domestic violence. Father had been engaging in parenting time and had just begun his case management services. Father felt that DCS was attempting to separate him from Mother and that the March 26, 2019, incident "only happened because of [DCS'] actions." (Tr. Vol. II, p. 207). Father testified that he may have "crushed a few pieces of cardboard" in Mother's home on March 26, 2019, but denied destroying part of the home. (Tr. Vol. II, p. 214).

[10] On June 13, 2019, the trial court issued its Order declaring the Children to be CHINS and entered the following relevant findings of fact and conclusions:

26. [The Children's] physical and mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [their] parent, guardian, or custodian to supply [them] with necessary food, clothing, shelter, medical care, education, or supervision. The domestic violence between [Mother] and [Father] creates an environment that endangers the [C]hildren's physical and emotional well-being. The [c]ourt acknowledges that the [C]hildren's physical needs were being met at the time of the DCS' assessment. However, the [c]ourt does not need to wait until children are injured before taking action. This violence has continued as [Father] attacked [Mother] in the family residence between the first and second setting of the fact-finding conducted in this matter. . . . The continued violence relating to [Mother and Father] . . . needs to be addressed in order for the [C]hildren to be safe.

27. [The Children] need care, treatment, or rehabilitation that the [Children are] not receiving and is unlikely to be provided or accepted without the coercive intervention of the [c]ourt. Despite documented information to the contrary, [Mother] and [Father] deny that violence has occurred between them. The coercive intervention of the [c]ourt is necessary to ensure that the [C]hildren receive safe and appropriate care while their parents are addressing the issues of violence in their relationships.

(Mother's App. Vol. II, pp. 162-63).

Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Waiver*

Father presents us with numerous claims which the State contends are waived. As a threshold matter, we observe that Father proceeds *pro se* on appeal, as he

did at the trial level. It has been long-established that *pro se* litigants are held to the same standards as licensed attorneys and are required to follow procedural rules. *Martin v. Brown*, 129 N.E.3d 283, 284 (Ind. Ct. App. 2019).

[13] Father's Brief of Appellant does not comply with several appellate procedural rules. His Statement of Facts is not compliant with Indiana Appellate Rule 46(A)(6)(a)-(c) in that it consists of numbered single sentences and is not in narrative form; consists largely of argument relying on facts that do not support the trial court's judgment, in contravention of the applicable standard of review; and contains no citation to the Record on Appeal or Appendix. Father's failure to provide citation to the Record on Appeal has materially impeded our review.[3]

[14] Of greater consequence, however, is Father's failure to comply with Appellate Rule 46(A)(8)(a) and (b) which provide that an appellant's argument must cite the applicable standard of review and be supported by cogent reasoning with citations to the legal authorities and portions of the Record on Appeal relied upon. A failure to present a cogent argument results in waiver of the issue on appeal. *Martin*, 129 N.E.3d at 285.

[15] In his Statement of the Issues, Father presents us with the following:

---

[3] In his Reply, Father claims that he did not cite the Record on Appeal because "he had never received nor viewed a copy, despite claims made by the trial court clerk to the contrary. Appellant has made numerous attempts to secure a copy, to no avail." (Father's Reply Br. p. 6). Father never sought this court's assistance to procure a copy of the Record on Appeal.

1. Whether DCS and the trial court conducted the proceedings in a lawful manner? A [*de novo*] review of DCS and judicial compliance with [I.C. §] 31-34-10-2(b), [I.C. §] 31-34-5-1, [I.C. §] 31-34-5-2, [I.C. §] 31-34-9-5, [I.C. §] 31-34-4-6 and their interpretation is appropriate?

2. Whether the trial court abused its discretion by failing to take notice of FCM [] Tucker's admission of falsifying official documents and perjury during her 03/20/2019 testimony?

3. Whether the trial court ever had subject matter jurisdiction?

4. Whether evidence was sufficient to adjudicate the minor child as a CHINS?

5. Whether Appellant was given due process at every stage of the proceedings?

6. Whether DCS violated the law and rights of Appellant and his minor child.

(Father's Br. p. 7). Out of these six issues, Father only develops argument regarding his claims of violations of the CHINS procedural statutes as presented in Issue (1) and the sufficiency of the evidence supporting the trial court's CHINS determination, as presented in Issue (4). None of the remaining issues are developed under separate headings in the Argument section of Father's Brief. In addition, Father does not mention the evidentiary or subject matter jurisdiction claims elsewhere in the Argument section of his Brief. In addition, Father's due process claim, as presented in Issue (5), and his contention in Issue (6) that "the law and rights of Appellant and his minor child" were violated are too vague for us to discern what he is alleging. (Father's Br. p. 7). Because Father has failed to develop a cogent argument on these issues, they are waived.

*See Martin*, 129 N.E.3d at 285 (noting that a finding of waiver is appropriate where violation of the appellate rules substantially impedes the court's ability to determine and review the issues alleged).

[16] Father's procedural claims as presented in Issue (1) are equally unsupported by full citation to the appropriate standard of review, any citations to the record, or citations to relevant authority apart from the statutory provisions themselves. In addition, Father incorporates a Fourth Amendment claim into the Argument section of his Brief that is not mentioned in his Statement of the Issues. This Fourth Amendment claim is also unsupported by citation to a standard of review and citations to the record. However, given the importance of the interests at stake, we shall address these claims and Parents' mutual claim that the evidence does not support the trial court's CHINS determination.

## II. *Fourth Amendment*

[17] Father presents a one-sentence argument that "FCM Tucker ignored Appellants objections to her entry into the home and proceeded to conduct an investigation on private property, a clear violation of the Appellants 4th amendment rights (Doe V Heck 327 F.3d 492 [7th Cir 2003], Georgia V Randolph 547 U.S. 103 [2006]) [sic throughout]." (Father's Br. p. 11). Father's claim is presumably based on FCM Tucker's entry into Mother's home on December 14, 2018, to interview Parents. As a general rule, we review constitutional challenges on a *de novo* basis. *See In re Adoption of I.B.*, 32 N.E.3d 1164, 1169 (Ind. 2015).

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "As the purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials, a warrant is required during civil as well as criminal investigations unless some recognized exception to the warrant requirements applies." *In re J.V.*, 875 N.E.2d 395, 399-400 (Ind. Ct. App. 2007), *trans. denied*. The Fourth Amendment applies to the actions of child welfare workers, as well as all other governmental employees. *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (relying on *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978)).

"One well-recognized exception to the warrant requirement is a voluntary and knowing consent to search." *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). FCM Tucker's Assessment of Alleged Child Abuse or Neglect, admitted as Father's Exhibit C at the CHINS fact-finding hearing, contained a narrative report indicating that on November 14, 2018, Mother "agreed upon FCM [Tucker] coming to the family's home on November 15, 2018, at 6:00 p.m." (Respondent Exh. C, Exh. Vol. I, p. 79). On November 15, 2018, Mother texted FCM Tucker that

> [t]his is [Mother] and I wanted to also inform you that not only do I know my rights that being said I will allow you to observe my home I will not allow you to speak to my children you can observe my children in our home but you will not be allowed to

speak to them unless you have something from a judge that you can provide to me saying that you can talk to the children in the home . . . once you arrive I will be needing some identification I also will be needing proof of the alleged allegations against me and I will also be letting you know you are not allowed to speak to my children you will only be able to observe my home and observe my children inside the home.

(Respondent's Exh. C, Exh. Vol. I, p. 79). After receiving this text, FCM Tucker "contacted [Mother] back about getting a Court Order and [Mother] was in agreement." (Respondent's Exh. C, Exh. Vol. I, p. 79). On November 30, 2018, Parents were served with a notice for a Motion to Compel Hearing set for December 17, 2018. On December 12, 2018, Mother contacted FCM Tucker, and Mother "agreed upon FCM [Tucker] coming to the family's home on 12/14/18 at 6:00 p.m." (Respondent's Exh. C, Exh. Vol. I, p. 79). On December 27, 2018, Mother testified at the initial hearing on the CHINS petition that she allowed FCM Tucker into her home voluntarily. Therefore, assuming, without deciding, that FCM Tucker's entry of Mother's home on December 14, 2018, constituted a search or seizure for purposes of the Fourth Amendment, we conclude that Mother consented to it.

[20] In his Reply, Father asserts that FCM Tucker "used threats of court action and her official position to obtain consent to enter the home from Appellant Mother" which he contends invalidated Mother's consent. (Father's Reply p. 6). However, we observe that the CHINS statute provides that a DCS assessment may include a visit to the home of a child suspected to be a victim of neglect. I.C. § 31-33-8-7. In addition, a copy of the Motion to Compel filed by

FCM Tucker is not part of the Record on Appeal. Parents did not question FCM Tucker at the fact-finding hearings regarding the detailed circumstances of her entry on December 14, 2018. On the record before us, we are unable to conclude that FCM Tucker's act of filing a motion to compel rendered Mother's consent involuntary.

[21] Father also asserts in his Reply that he "presented himself as having common authority over the premises, [t]herefore, FCM [Tucker] [s]hould have yielded to Appellants refusal to grant consent for home entry." (Father's Reply, p. 6). Father relies on *Georgia v. Randolph*, 547 U.S. 103 (2006), in which, following a domestic dispute, law enforcement obtained the wife's consent to search the home despite the husband's explicit objection. *Id*. at 107. The Court held that a co-tenant "has no recognized authority in law or social practice to prevail over a present and objecting co-tenant." *Id*. at 114. However, we find this case to be distinguishable, as Mother had told DCS in August of 2018 that Father would no longer be living in the residence, and DCS declined to substantiate neglect allegations based on Mother's assurances. Father does not provide us with citations to the record to support his claim that he presented himself as having apparent common authority over the home on December 14, 2018.

[22] Father's claim that Indiana's Child Welfare Policy Manual dictated that FCM Tucker's entry on December 14, 2018, was improper fails for the same reason. Father cites the portion of the policy that provides that "[i]f one adult who lives in a home gives permission to enter, and a second adult who lives in the home verbally objects, DCS will not enter the home and will instead seek a court

order." Ind. Dept. of Child Servs., *Ind. Child Welfare Policy Manual* § 4.8 (2008), *available at* http://www.in.gov/dcs/2537.htm. Assuming, without deciding, that the policy contained in the Manual was binding on FCM Tucker and its violation constituted a Fourth Amendment violation, Father provides us with no evidence within the Record on Appeal that he lived in the home or presented himself as having apparent authority over Mother's home on December 14, 2018. Therefore, we conclude that, on the record and argument before us, FCM Tucker's entry into the home on December 14, 2018, to conduct her investigation did not violate the Fourth Amendment.

### III. *Statutory Violations*

Next, we address Father's host of one-sentence claims related to what he argues were violations of the CHINS procedural statutes during the initial proceedings in the case. We note that, in his Statement of the Issues, Father urges us to conduct a *de novo* review of the statutes at issue and interpret them if appropriate. Father does not develop any further argument that the statutes he relies on are ambiguous or in need of construction. We conclude that Father has waived any claim that the relevant statutes require interpretation. *See Martin*, 129 N.E.3d at 285. "If a statute is clear and unambiguous, it leaves no room for judicial construction and simply requires that we take words and phrases in their plain, ordinary, and usual sense." *R.L.-P.*, 119 N.E.3d 1098, 1103 (Ind. Ct. App. 2019). Because there is no argument before us that the statutes at issue are in need of construction, we shall examine their application

to this case giving the words used in the statutes their ordinary meanings. *See id*.

### A. *Indiana Code Section 31-34-10-2(b)*

[24] Father contends that "DCS set the time and date for the initial hearing six days before filing anything with the court, violating [I.C. §] 31-34-10-2(b)." (Father's Br. p. 11). The relevant portions of the statute provides that

> (a) The juvenile court shall hold an initial hearing on each petition within ten (10) days after the filing of the petition.
>
> (b) The juvenile court shall set a time for the initial hearing. A summons shall be issued for the following:
>
> (1) The child.
>
> (2) The child's parent, guardian, custodian, guardian ad litem, or court appointed special advocate.
>
> (3) Any other person necessary for the proceedings.

I.C. §§ 31-34-10-2(a)-(b). Thus, the CHINS statute requires that a juvenile court set a time for the initial hearing on the CHINS petition and hold the hearing within ten days of the filing of the petition.

[25] Father claims, without citation to the record, that the time and date for the initial hearing was set six days before the CHINS petition was filed. It is well-settled that a trial court speaks through its chronological case summary (CCS) or docket. *Beeler v. State*, 959 N.E.2d 828, 830 (Ind. Ct. App. 2011), *trans. denied*. Our review of the CCS in each of the CHINS cases filed for the

Children revealed that the CHINS petitions were filed on December 27, 2018, and that the initial hearing on the petitions was held on the same day. There is nothing in the CCS that indicates to us that the initial hearing was set before the filing of the CHINS petition. Therefore, we find no factual support in the record for Father's argument.

### B. *Indiana Code Section 31-34-4-6*

[26] Father next argues that "[t]he Initial Hearing was held on 12/27/2018 just hours after DCS filed its initial pleadings, effectively violating IC 31-34-4-6 and denying any semblance of due process (Mullane V Central Hanover Bank and Trust Co, et al 339 U.S. 306 [1950]) [sic throughout]." (Father's Br. p. 11). Indiana Code section 31-34-4-6 provides that DCS shall submit written information to the parents of a child who is alleged to be a CHINS regarding the parents' legal rights, including the right to have a detention hearing within forty-eight hours after child's removal at which return of the child may be requested; parents' right to be represented by an attorney, to cross-examine witnesses, and present evidence at each CHINS court proceeding; and their right not to incriminate themselves in the proceedings. *See* I.C. § 31-34-4-6(a)(1)-(3). DCS is required to submit this written advisement to parents at the time the child is taken into custody or when the CHINS petition is filed, whichever occurs earlier. *See* I.C. § 31-34-4-6(b).

[27] Father does not specify in his argument what portion of the statute he contends was violated. DCS filed the CHINS petitions on December 27, 2018. At the time of the filing of the CHINS, the Children had not yet been removed from

the home. DCS served Parents with a Summons and Notice of Rights notifying them that CHINS petitions had been filed and containing language largely tracking Indiana Code section 31-34-4-6(a). The Summons and Notice of Rights informed Parents of the time and place of the initial hearing. The trial court held a combined initial hearing and detention hearing later in the day on December 27, 2018, and was thus in compliance with the forty-eight-hour time limit for a detention hearing. Parents appeared at the hearing, and the trial court appointed attorneys for Parents. We conclude that DCS and the trial court complied with the procedural strictures of Indiana Code section 31-34-4-6.

### C. *Indiana Code Section 31-34-9-5(a)*

[28] Father also argues that "in violation of [I.C. §] 31-34-9-5(a), [FCM Tucker] verbally requested removal of minor child with no cause shown on the record as to why it was necessary." (Father's Br. p. 11). Indiana Code section 31-34-9-5(a) provides that "[i]f a petition is authorized, the person filing may request in writing that the child be taken into custody." Father seemingly argues that DCS never requested removal of the Children from the home in writing.

[29] We agree with Father that neither the CHINS petition nor the Report of Preliminary Inquiry and Investigation filed in conjunction with the CHINS petition contains an explicit request that the Children be removed from the home. When those documents were prepared, DCS had decided to file the CHINS petition in order to procure services for Parents and the Children, but it had also decided not to request removal of the Children from the home. The

CCS in these matters indicate that on December 27, 2018, DCS filed a request for authorization to file a CHINS petition at 9:20 a.m. DCS then filed a copy of the proposed CHINS petition itself at 11:00 a.m. that contained FCM Tucker's verified statements alleging that Parents had "failed to provide the [C]hildren with a safe, stable, and appropriate living environment free from domestic violence" and that Parents "refused to sign a safety plan, and they have not taken necessary action to address the issue of domestic violence in their relationship." (Mother's App. Vol. II, p. 33). The CHINS petition also contained a request that "if and when the Court approves removal of the child from the home" and placed child in a foster home, existing support payments be assigned to DCS for the duration of placement outside of the home. (Mother's App. Vol. II, p. 34). This provision in the CHINS petition provided some notice to Parents in writing that removal was a possible outcome of the filing of the petition.

[30]     The trial court approved the filing of the CHINS petitions at 11:15 a.m. At the ensuing initial and detention hearing held at 1:30 p.m. later in the day on December 27, 2018, FCM Tucker explicitly requested the removal of the Children from the home and explained that DCS' in-home placement recommendation "was always sort of tenuous" and was contingent upon Parents' cooperation with DCS and participation in services, which was not forthcoming. (Tr. Vol. II, p. 31). We conclude that, even if the CHINS petition itself did not contain an explicit request by DCS to remove the Children from the home, Father does not explain on appeal how he was prejudiced by being

verbally informed of that request at the initial and detention hearing held only hours after the filing of the CHINS petition. In addition, Father does not present us with any legal authority for his proposition that a failure on DCS' part to strictly comply with section 31-34-9-5(a) requires reversal. Under the circumstances of this case, we are not inclined to reverse the trial court's CHINS determination on that basis.

### D. *Combined Initial and Detention Hearing*

Father's last claim of procedural error is that "the trial court has been in violation of [I.C. §] 31-34-5-1 by never holding a proper detention hearing despite requests made by Appellant." (Father's Br. p. 11). Indiana Code section 31-34-5-1(a) provides that, if a child taken into custody under Indiana Code section 31-34-2 is not released, a detention hearing must be held within forty-eight hours. Indiana Code section 31-34-2-1 provides that a child may be taken into custody with a court order. The remaining sections of 31-34-2 set out procedures for taking a child into custody without a court order.[4] *See* I.C. § 31-34-2-2, *et seq*.

The Children were still in the home at the time that the CHINS petition was filed on December 27, 2018. They had not yet been removed with or without a court order. Thus, by its plain terms, section 31-34-2-1 does not apply to the

---

[4] I.C. § 31-34-2-5 concerns procedures to be followed if a CHINS is a missing child and is taken into custody under a court order, a provision that is not implicated in this case.

circumstances of this case.[5]  Later in the day on December 27, 2018, after the filing of the CHINS petition, the trial court held a combined initial and detention hearing where Parents were present and afforded an opportunity to be heard regarding DCS' allegations of neglect and its request for removal.  At the conclusion of the hearing, the trial court ordered the Children to be removed from Parents' care.  Thus, the trial court held a detention hearing.  Father provides us with no legal authority for his apparent proposition that he was entitled to a second detention hearing after the Children were removed from the home following the December 27, 2018, detention hearing, and we are aware of none.  Accordingly, we find no error on the part of the trial court.

## IV.  *Sufficiency of the Evidence*

[33]  Parents challenge the sufficiency of the evidence supporting the trial court's CHINS determination.  More specifically, Parents argue that the evidence did not show that the Children were seriously endangered or that the court's coercive intervention was necessary to meet the Children's needs.

---

[5]  In his Reply, Father also argues that the "Indiana Child Welfare Policy Manu[a]l states unequivocally that a combined hearing only takes place when a child is already removed from the home, sans court order (Ch 6 Sec 1 pg 5)."  (Father's Reply p. 7).  The Policy Manual provides that a "Detention/Initial hearing will always be combined unless DCS requests a Detention Hearing to obtain a court order prior to taking custody of a child."  Ind. Dept. of Child Servs., *Ind. Child Welfare Policy Manual* § 6.1 (2017), *available at* http://www.in.gov/dcs/2537.htm.  This provision does not prohibit a trial court from holding a combined Initial and Detention hearing where, as here, DCS has already filed a CHINS petition and then petitions the trial court for removal.

A. *Standard of Review and Statutory Requirements*

[34] The appellate courts generally accord latitude and deference to trial courts in family law matters. *Matter of E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied*. Our standard of review of a trial court's CHINS determination is well-settled: we do not reweigh the evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). We consider only the evidence which supports the trial court's decision and the reasonable inferences to be drawn from that evidence. *Id.* at 1287. In addition, where, as here, the trial court has entered findings of fact and conclusions of law, we exercise a two-tiered review. *Matter of K.P.G.*, 99 N.E.3d 677, 681 (Ind. Ct. App. 2018), *trans. denied*. First, we consider whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* We will reverse a trial court's CHINS determination only if it is clearly erroneous and a review of the record leaves us firmly convinced that a mistake was made. *Id.* at 681-82. A CHINS determination is clearly erroneous "if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (internal quotation marks omitted).

[35] DCS sought to have the Children adjudicated CHINS under Indiana Code section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision . . . and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[36] Thus, an adjudication under this section "requires three basic elements:  that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.  DCS was required to prove that the Children were CHINS by a preponderance of the evidence.  *See* I.C. § 31-34-12-3.  In rendering a CHINS determination, the trial court considers the family's condition not just when the petition was filed, but also when the petition is heard.  *In re S.D.*, 2 N.E.3d at 1290.

### B.  *Endangerment*

[37] The trial court acknowledged in its Order that the Children's physical needs were being met at the time of DCS' assessment.  However, it found that the Children were endangered by the "domestic violence between [Mother] and [Father] [that] creates an environment that endangers the [C]hildren's physical and emotional well-being."  (Mother's App. Vol. II, p. 163).  This conclusion

was supported by ample evidence in the record establishing a pattern of violence between Mother and Father which first brought DCS into this family's lives on August 2, 2018, when Mother reported to DCS that she had sought the assistance of law enforcement several times in the past due to violence with Father and that she had kicked Father out of her home. However, another episode of violence occurred on November 12, 2018, in which E.W. intervened, causing Mother to call 9-1-1. Despite the initiation of CHINS proceedings, Mother allowed Father into her home on March 26, 2019, and an argument ensued which resulted in Father physically attacking Mother and causing property damage in the home. This court has recognized that a child's exposure to domestic violence may support a CHINS findings. *Matter of D.P.*, 72 N.E.3d 976, 984 (Ind. Ct. App. 2017). Indeed, even a single incident of domestic violence in a child's presence may support a CHINS determination; the violence need not be repetitive. *Id*. We find that the multiple episodes of violence between Mother and Father, at least one of which involved E.W., supports the trial court's conclusion that the Children were endangered.

[38] Nevertheless, Parents argue that DCS failed to show that the Children were neglected or endangered at the time of removal because all of their needs were being met. Mother contends that there "was no evidence in the record that Mother failed to provide food, clothing, shelter, supervision, education, therapy, and financial support for her children without the assistance of DCS." (Mother's Br. p. 35). Father directs our attention to the Report of Preliminary Inquiry and Investigation indicating that the Children had no mental or

physical health issues, were well-bonded with Parents, and that placement in the home was a key strength. We find that these arguments are not well-taken because, although the trial court included in its Order language that tracked the CHINS statute, it acknowledged that the Children's physical needs were being met, and it made an explicit finding of neglect based on domestic violence in the home. Parents' arguments are unpersuasive because they amount to an invitation for us to consider evidence that does not support the trial court's determination, which is contrary to our standard of review. *In re S.D.*, 2 N.E.3d at 1287.

[39] Regarding the domestic violence itself, Mother argues that the Children were not present for the March 26, 2018, incident, she immediately contacted the police and a service provider, Father was no longer living in the home, and she was participating in services by the time of the fact-finding hearings. In addition, Father directs our attention to a statement entered as part of the initial assessment that there was no need for intervention or any evidence that the Children ever witnessed family violence. However, to credit Mother's arguments would be to overlook the pattern of violence between Parents as well as Mother's habit of allowing Father access to the home even if he was not officially living there. Father's argument is unpersuasive because it ignores evidence in the record that E.W. was present and even involved in the November 12, 2018, incident. Parents also essentially ask us to consider evidence that does not support the trial court's determination, in contravention to our standard of review. *See id*. We conclude that ample evidence supported

the trial court's conclusion that the Children were endangered by the domestic violence between Parents, and, therefore, the trial court's conclusion was not clearly erroneous. *See Yanoff*, 688 N.E.2d at 1262.

### C. *Coercive Intervention*

[40] Parents also challenge the trial court's conclusion that its coercive intervention was necessary to ensure the Children's safety. The evidence showed that Parents demonstrated a pattern of denying and downplaying the violence between them. Despite reporting on August 2, 2018, December 14, 2018, and March 26, 2019, that she had experienced violence at Father's hands and telling her first therapist so as well, Mother repeatedly denied at the fact-finding hearings that she had ever been involved in domestic violence with Father. During the pendency of the CHINS proceedings, Father contacted the FCM permanency caseworker to report that Mother had borderline personality disorder, she was abusive, and that the Children needed to be protected from her. However, Father denied doing this at the fact-finding hearing. At the fact-finding stage, Father also flatly denied any violence between him and Mother. Regarding the March 26, 2019, incident, which resulted in Mother being injured and her living room "destroyed," Father merely admitted that he had perhaps crushed some cardboard and blamed the incident on DCS. (Tr. Vol. II, p. 171).

[41] In addition, Parents were not cooperative with DCS from the beginning of the case. Parents refused on multiple occasions to sign a safety plan stating that they would not engage in further acts of domestic violence. Mother continued

to grant Father access to her and to her home despite telling DCS in August 2018 that Father would not be present and she would no longer be in a relationship with him. Indeed, Mother arrived at the first fact-finding hearing with Father. Although Parents eventually participated in services, by the time of the second fact-finding hearing, Father had just started his case management services, and Mother had not completed her domestic violence services. In addition, the latest episode of violence between Parents occurred between the fact-finding hearings in this matter, indicating that intervention continued to be necessary.

[42] Mother argues that the evidence supporting the trial court's conclusion was inadequate because, by the time of the fact-finding hearings, she was participating in therapy and domestic violence services. She also argues that she did not sign the safety plan because she did not understand it, was without counsel, and was asked to do so in front of Father, her abuser. However, as Mother acknowledges, by the second fact-finding hearing she had not completed all her services. In addition, her denials to her second therapist as recently as late February 2019 that she had experienced domestic violence, her denials at the fact-finding hearings that domestic violence had ever taken place, and the March 26, 2018, incident indicated that continued coercive intervention was necessary, despite Mother's participation in services. In addition, we note that Mother did not agree to sign a safety plan until the week of April 1, 2019, well after she had been appointed counsel and Father was purportedly out of the home, which indicates that Mother's reluctance to cooperate with DCS to

ensure the Children's safety was not entirely due to the factors she cites. In light of Parents' denials that domestic violence was an issue for them, Parents' reluctant and partial efforts to cooperate with DCS, and the ongoing violence between them, we conclude that the trial court's conclusion that its coercive intervention remained necessary to ensure the Children's safety was not clearly erroneous. *See Matter of K.P.G.*, 99 N.E.3d at 681.

## CONCLUSION

Based on the foregoing, we conclude that Father waived several of his appellate claims, Father's Fourth Amendment rights were not violated, DCS and the trial court did not violate any CHINS procedural statutes, and the trial court's CHINS determination was supported by the evidence and was not clearly erroneous.

Affirmed.

Baker, J. and Brown, J. concur